**Floyd SANDERS, III, Plaintiff–Appellant,**

v.

**Don ENGLISH, Curtis McCoy, Ed Perry, and the City of Mansfield, Defendants–Appellees.**

No. 91–4293.

United States Court of Appeals, Fifth Circuit.

Jan. 21, 1992.

---

Nelson W. Cameron, Shreveport, La., for plaintiff-appellant.

A.M. Stroud, III, Blanchard, Walker, O'Ouin, Shreveport, La., for defendants-appellees.

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.

GOLDBERG, Circuit Judge:

This is the case of the bicycle bandit.

## INTRODUCTION

On February 15, 1989, Curtis McCoy, a police lieutenant with the City of Mansfield, arrested Floyd Sanders pursuant to a warrant. Sanders had been identified as the assailant in an armed robbery which had occurred several weeks before. Too poor to post a $50,000 bond, Sanders remained incarcerated pending trial. Within two days of the arrest, information came to Lt. McCoy's attention indicating that he had arrested the wrong man: Sanders had an alibi corroborated by three credible witnesses, and another witness who had seen the assailant flee the scene of the robbery stated that Sanders was not the assailant. Lt. McCoy neither acted on the information, nor brought it to the attention of the police chief or the prosecuting attorney who, in the interim, filed an information charging Sanders with the armed robbery. Sanders' attorney, on the strength of the alibi defense, eventually persuaded the prosecuting attorney and the trial judge to reduce the bond to an amount which Sanders' family could post, but by then, Sanders had already been incarcerated for fifty days. A grand jury later declined to indict Sanders, and the prosecuting attorney dismissed the case.

Sanders responded by filing this lawsuit in federal district court under 42 U.S.C. § 1983, alleging that the arresting police officers, the police chief, and the City of Mansfield had violated his federal and state constitutional rights by arresting, detaining, and prosecuting him for the armed robbery. The district court dismissed Sanders' complaint on motion by the defendants for summary judgment, and this appeal followed.

## STANDARD OF REVIEW

■■■ Because this case comes to us on appeal from a summary judgment, we are obliged to review the record and construe the facts in the light most favorable to Sanders, the nonmoving party in the court below. All reasonable inferences which can be drawn from the facts must be construed to support Sanders' theory of the case, and any genuine dispute of fact must

be resolved, for purposes of the summary judgment motion, in Sanders' favor. *See International Shortstop, Inc. v. Rally's*, 939 F.2d 1257, 1263 (5th Cir.1991). We may not weigh the evidence or make credibility determinations. We merely review the record to determine whether there is evidence, which if submitted to and credited by a jury, could support a verdict for Sanders. If there is, he is entitled to a trial. *See id.*.

With this standard of review in mind, we set forth the facts in the light most favorable to Sanders.

## FACTS

In the early morning hours of January 23, 1989, a man on a bicycle robbed Herman Sandifer at gunpoint. Mr. Sandifer, a seventy-year old resident of Mansfield, Louisiana, could not identify the assailant as someone known to him, but he did give police a physical and facial description of the assailant. A school crossing guard and a service station attendant who were both nearby also gave a description of the assailant and assisted police in composing a sketch of the assailant, which was then circulated in the local newspaper.

Defendant Curtis McCoy, a police lieutenant with the City of Mansfield, undertook the investigation of what police dubbed the case of the "bicycle bandit." Because other elderly residents of Mansfield had been assaulted and robbed in recent weeks in similar fashion, the case received considerable media attention in Mansfield, pressuring police to make an arrest. Unfortunately, the police made little immediate progress in identifying and arresting the assailant.

During the next several weeks, Lt. McCoy received a number of telephone calls from persons suggesting that Floyd Sanders matched the description of the bicycle bandit. Lt. McCoy knew Sanders, and noticed that there indeed was a resemblance between Sanders and the police sketch. Other suspects, however, were still under consideration, and Lt. McCoy made no effort to investigate Sanders' possible connection to the robberies.

On February 15, 1989, more than three weeks after the Sandifer robbery, Lt. McCoy was in court on an unrelated matter and noticed that Sanders was there. Rather than arrange for a formal line-up, he instructed another police officer to call Mr. Sandifer and have him come down to the courthouse so that he might "identify any particular one in the courtroom because all the so-called criminals [were] there at the time."[1] Mr. Sandifer proceeded to the courtroom where Lt. McCoy was waiting for him. Sanders, who was in the courtroom, was seated next to a young man who Mr. Sandifer knew very well.[2] During a recess, Lt. McCoy asked Mr. Sandifer whether he recognized anyone in the packed courtroom as the bicycle bandit. Mr. Sandifer identified Sanders *by name*. With that information, Lt. McCoy sought and obtained an arrest warrant for Sanders. Before arresting Sanders, however, Lt. McCoy telephoned a reporter for the local newspaper, the "Mansfield Enterprise," and told her to meet him in five minutes at the courthouse so that she could photograph the arrest of the bicycle bandit.[3]

Armed with an arrest warrant and assisted by the other police officer,[4] Lt. McCoy

---

1. When asked whether any other suspects of the armed robbery were present in the courtroom, Lt. McCoy "couldn't say" because he "couldn't tell ... who all was there."

2. The young man was Clyde Washington, who according to Lt. McCoy, Mr. Sandifer had "sort of raised ... like a son or something like that." Mr. Sandifer obviously knew Clyde Washington intimately, raising the inference that the identification procedure was somewhat suggestive.

3. Lt. McCoy deposed that he did not know how the information leaked out to the press, implicit-

ly denying that he had contacted the press. To the extent that Lt. McCoy in fact called the newspaper (but denies doing so), one may reasonably infer that Lt. McCoy sought publicity and personal recognition for making the arrest.

4. The other police officer was also named as a defendant in the complaint, but the case against him was dismissed for want of prosecution. Sanders did not appeal from that order.

arrested Sanders in the courthouse. Handcuffed and escorted by the two policemen, Sanders was photographed on the steps of the courthouse by the Mansfield Enterprise reporter. The photograph of Sanders and Lt. McCoy appeared on the front page of the newspaper the following day in connection with the headline, " 'Bicycle Bandit' Suspect Arrested Here Wednesday." The newspaper credited Lt. McCoy with the capture of the bandit and identified him as the officer in the photograph making the arrest. Sanders' bond was set at $50,000, and because he could not raise the necessary funds, Sanders remained incarcerated.

Within two days after the arrest, critical information surfaced casting considerable doubt on whether Sanders was in fact the bicycle bandit:

First, Lt. McCoy was informed *on the day of the arrest* that Sanders and Mr. Sandifer were related, explaining how Mr. Sandifer was able to identify Sanders by name in the packed courtroom. Lt. McCoy deposed that he found no peculiarity in the fact that Mr. Sandifer was related to, and knew, Sanders, yet could not name him as the assailant until the identification Lt. McCoy arranged at the courthouse more than three weeks following the armed robbery. According to Lt. McCoy:

> [Mr. Sandifer] told me that he did not know then, but that once he seen Mr. Sanders, that's when it all came back to him that Mr. Sanders was the guy who did, in fact, rob him.... From the way that Mr. Sandifer talked [on the day of the robbery] you could pretty well tell that that particular morning he was shook up, and he seen the person as they was walking or running away from him, and at that time he told me if he seen that person again, he would know him. He said it was no doubt in his mind that if he seen that person he would know him, and it proved to be so.

Lt. McCoy did not inform Chief of Police Don English or the prosecuting attorney of the relation between Sanders and Mr. Sandifer.[5]

Second, the service station attendant who had assisted in composing the sketch of the bandit told Lt. McCoy, *on the day after Sanders' arrest*, that Sanders was not the bandit. Lt. McCoy deposed that he "had every reason to believe" the service station attendant, whom he described as a "nice guy," but was not persuaded that the statement cast sufficient doubt on Mr. Sandifer's positive, though belated, identification. Accordingly, Lt. McCoy deliberately declined to take any further investigative steps in reaction to the service station attendant's statement; Lt. McCoy did not even attempt to speak with the school crossing guard, who had also assisted in developing the composite sketch of the bicycle bandit, to determine whether he could confirm Mr. Sandifer's identification.

Third, Lt. McCoy presented a photograph array to the other elderly victims of the bandit-style armed robberies because of a perceived connection between those incidents and the Sandifer robbery. None of the *other* victims identified Sanders as the assailant.

Fourth, and perhaps most significantly, Lt. McCoy learned, *one or two days after the arrest*, that Sanders had an alibi corroborated by three credible witnesses, all of whom were acquaintances of Lt. McCoy. The three men visited Lt. McCoy at his home and explained that they were with Sanders on the morning of January 23, 1989, during the time of the armed robbery, doing some work *out of town*. Although Lt. McCoy felt "comfortable" with their credibility, he nevertheless took no action because he felt that "they would have to give [him] more to go on than that." Instead, he told the three alibi witnesses that they would have to tell their story to the court.

A few days later, one of the three alibi witnesses, Reginold Elam, went to see Lt. McCoy again, this time at the police station. Elam was a reserve police officer and

---

5. Lt. McCoy neither checked into Mr. Sandifer's background or criminal history, nor obtained any information about Mr. Sandifer's eyesight.

He did acknowledge, however, that Mr. Sandifer was also known by the alias Tom Bell.

personal friend of Lt. McCoy's for twelve years; in fact, it was Lt. McCoy who had recruited Elam for that police reserve. Elam reiterated that Sanders could not possibly have committed the crime. He told Lt. McCoy that one of the other alibi witnesses had found a cancelled check reflecting payment for the job that they had performed on the morning of the armed robbery, further corroborating the alibi. Again, Lt. McCoy showed no interest. As Elam recounted in his deposition:

> [Lt. McCoy] just said that we had to go down to the DA's office—I mean I would have to go down to the DA's office or either to the mayor to get the charges dropped. *He said he wasn't going to do anything to get the charges dropped.* He said he was sure he had the right man, and I asked him did he have any physical evidence.
>
> He said he had enough. I said "Do you have a bicycle? Do you have a gun?" I said, "This man probably hasn't ridden a bicycle in probably twenty years." You know, he got a little upset, and I said, "Since we haven't had an argument during the twelve years we've been associated with each other, I'll just leave this alone right now," and then I handled it through the DA's office to the best of my ability.

Elam indicated that Lt. McCoy never expressed any concern that an innocent man might be in jail. As far as Elam could gather, Lt. McCoy was simply not interested in attempting to determine "the truth in this case." Indeed, Lt. McCoy did not even inform Chief English that the three men had come to him with the alibi statements.[6]

Contrary to Lt. McCoy's statements to the press at the time of arrest that the investigation was only just beginning, for all intents and purposes, it had ended. Lt. McCoy did not follow up on any of the investigative leads, knowing that Sanders would languish in jail until the case terminated.[7] Nor did he keep Chief English up to date on the details that he learned subsequent to the arrest, even though he routinely did so in other cases. Even after learning about all of the evidence calling into question the reliability of Mr. Sandifer's belated identification, Lt. McCoy stated that he still believed that Sanders was the bicycle bandit, based on nothing more than Mr. Sandifer's positive identification.

Lt. McCoy deposed that he would have investigated the alibi defense if Sanders had professed one at the time of his arrest. Lt. McCoy deposed that if the story checked out, he would have taken some action:

> I would have had my doubts about it, and I would have taken a course a little bit differently then ... I would have tried to see if [Sanders] was actually innocent on it. . . . Matter of fact, I would have went to the end to find out if he was innocent or not, and if I found that he was innocent on it, I would have went to the DA's office and come at it from that way.

To Sanders' misfortune, on the day of his arrest (some three weeks after the armed robbery), he could not pinpoint his whereabouts on the day of the armed robbery.[8]

Lt. McCoy acknowledged that the prosecuting attorney's office strongly considers his opinion as to the viability of a case and generally follows his recommendation in deciding whether to proceed with the prosecution. If Lt. McCoy had informed the prosecuting attorney of the peculiar circumstances surrounding the victim's identification, the exonerative statement by the service station attendant, and the credible alibi defense, the prosecutor might have dismissed the case against Sanders immedi-

---

6. Lt. McCoy deposed that he could not recall whether he put a list of the alibi witnesses in the police file or whether he responded to the prosecuting attorney's written request for a list of witnesses.

7. Lt. McCoy considered seeking, but ultimately elected not to seek, a search warrant for Sanders' home following the arrest to look for the bicycle and weapon used in the crime. He deposed that he could not recall why he made that decision.

8. Lt. McCoy's admission raises the disturbing possibility that Lt. McCoy altered his conduct to Sander's detriment in response to, and perhaps even in retaliation for, Sanders' inability to proffer an alibi, which under the Constitution, Sanders had no obligation to do.

ately (or at least sooner than it was). Instead, Lt. McCoy chose to do nothing while Sanders remained incarcerated.

Fortunately, the exculpating witnesses were not discouraged by Lt. McCoy's disinterested attitude. Elam spoke directly to Chief of Police English and the prosecuting attorney about Sanders' alibi. The service station attendant also spoke directly to Chief English. However, Chief English deposed that he did not believe that either Elam's statement or the service station attendant's statement merited action because Sanders was already arrested and the police often "hear a lot of things after a person has been arrested."

On March 1, 1989, one day before arraignment on the armed robbery charges filed by way of an Information, Sanders' counsel advised the prosecuting attorney of the alibi defense.[9] Sanders' counsel retained an investigator to interview all of the witnesses and, by the time of the preliminary examination of April 6, 1989, compiled a file containing most, if not all, of the facts already known to Lt. McCoy. The prosecuting attorney, the trial judge, and Sanders' counsel then convened in chambers to discuss the case. They concurred that the case against Sanders was very weak. By agreement, the trial judge reduced Sanders' bond from $50,000 to $2,000, Sanders' mother posted the bond for her son, and Sanders was finally released, some fifty days after his arrest. The prosecutor later presented the case to the grand jury, which returned a "no true bill," indicating that there was no probable cause to indict Sanders. Thereafter, the court dismissed the charges against Sanders.

## PROCEDURAL HISTORY

Sanders filed this § 1983 action in federal district court alleging both federal and state law causes of action in connection with his arrest and subsequent incarceration for fifty days. He alleged, *inter alia,* causes of action for false arrest, illegal detention,[10] and malicious prosecution.[11] Following discovery, Lt. McCoy, Chief of Police English, and the City of Mansfield collectively moved for summary judgment on the grounds that the evidence in the record did not support Sanders' claims. In a comprehensive report and recommendation, the magistrate judge to whom the case was referred recommended that the district court dismiss all of the federal claims with prejudice.[12]

Citing *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the magistrate judge concluded that Sanders' claim for false arrest was foreclosed by the undisputed evidence that his arrest was effectuated pursuant to a facially valid arrest warrant. The magistrate judge also concluded that Sanders' claim for illegal detention was not sustainable because Lt. McCoy had no duty to investigate Sanders' alibi defense. Finally, the magistrate judge recommended dismissal of Sanders' claim for malicious prosecution because the record contained "little, if any, evidence of malice," and, in any event, "the mental state of the defendant had no effect on the course of the prosecution ... because all of [the exculpatory] evidence was known to both the defense attorney and the district attorney's office." The magistrate judge concluded that "any malicious withholding of [the exculpatory] evidence could not possibly have affected the course of the prosecution."

---

**9.** The Mansfield Enterprise later reported that the district attorney spoke to several of the alibi witnesses and deemed them credible.

**10.** Sanders titled the cause of action "negligent investigation." However, the facts alleged in the body of the complaint and the facts adduced during discovery establish that the cause of action is not merely one for *negligent* investigation leading up to the arrest; the claim is also one for illegal detention based on the officers' *delib-*

*erate* failure to recognize, investigate, and disclose patently exonerative evidence which surfaced immediately following the arrest.

**11.** Sanders also alleged causes of action for defamation and failure to train; he presses neither of these claims in this appeal.

**12.** He recommended further that the district court dismiss, without prejudice, the pendent state law claims rather than entertain them.

■ The district judge, concurring with the magistrate judge's findings under the applicable law, dismissed with prejudice all of Sanders' federal claims brought under § 1983, and dismissed without prejudice Sanders' pendent state law claims. Sanders appealed, pressing only his claims against defendants McCoy and English for false arrest, illegal detention, and malicious prosecution.[13]

### CONSTITUTIONAL TORTS

As we intimated at the outset, our review of the record is plenary, *International Shortstop,* 939 F.2d at 1263, and "[i]n reviewing a grant of summary judgment, we use the same standard used by the district court." *Dorsett v. Board of Trustees of State Colleges & Universities,* 940 F.2d 121, 123 (5th Cir.1991). Having delved through the record to set forth all of the facts in a light most favorable to Sanders, we must now consider whether an application of the relevant law to those facts leads us to the inescapable conclusion that the defendants are entitled to a judgment in their favor as a matter of law.

■ We begin by observing that our circuit recognizes causes of action under § 1983 for false arrest, illegal detention (false imprisonment), and malicious prosecution. *E.g., Simmons v. McElveen,* 846 F.2d 337 (5th Cir.1988) (false imprisonment); *Hand v. Gary,* 838 F.2d 1420, 1424, 1427 (5th Cir.1988) (false arrest and malicious prosecution); *see also Brummett v. Camble,* 946 F.2d 1178, 1180 n. 2 (5th Cir. 1991) (tracing origins of malicious prosecution cause of action under § 1983). These causes of action implicate the constitutional "guarantees of the fourth and fourteenth amendments when the individual complains of an arrest, detention, and prosecution

without probable cause." *Thomas v. Kippermann,* 846 F.2d 1009, 1011 (5th Cir. 1988); *id.* at 1012 (Jolly, J., concurring). In order to overcome a properly supported motion for summary judgment, however, a plaintiff seeking recovery from a police officer for one of these constitutional torts must tender evidence establishing misconduct that exceeds mere negligence. *See Herrera v. Millsap,* 862 F.2d 1157, 1160 (5th Cir.1989) (summary judgment appropriate when plaintiff's evidence, at most, showed mere negligence in investigating facts before obtaining arrest warrant); *Simmons,* 846 F.2d at 339 (summary judgment appropriate when plaintiff's evidence merely established that defendants were negligent in conducting post-arrest investigation and in failing to inform district attorney's office of exculpatory evidence); *see also Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (negligent acts of official do not amount to deprivation of due process).

### Chief English

■ Our inquiry regarding Chief English ends here. Chief English did not partake in any of the activity leading up to Sanders' arrest. With respect to his role in Sanders' continued confinement and prosecution, the record is devoid of any evidence from which we can infer that Chief English was more than negligent in failing to investigate Sanders' claim of innocence. He deposed that he had no reason to give special credence to the statements of alibi witness Elam and the service station attendant. Lt. McCoy did not bring to his attention all of the other evidence undercutting Mr. Sandifer's positive identification, and therefore, Chief English personally did not pursue the matter any further. Apart from

---

**13.** We are aware that Sanders brought these claims against defendants McCoy and English in their individual and official capacities. Of course, a suit against these defendants in their official capacities is tantamount to a suit against the City itself. *Hafer v. Melo,* — U.S. —, 112 S.Ct. 358, 361–62, 116 L.Ed.2d 301 (1991). But the City may be held liable on account of the unconstitutional conduct by these officials only if "the entity's policy or custom ... played a part in the violation." *Id.* (citations and quota-

tions omitted). Because the district court held that neither McCoy nor English had engaged in conduct violative of the Constitution, it did not express an opinion on the question of whether the City's "policy or custom ... played a part in the violation" of Sanders' rights. Nor shall we. Instead, we leave that issue for the district court on remand. We also do not address any potential claims of qualified immunity, as they were not addressed below and have not been raised on appeal.

that limited involvement in the case, the record is silent as to Chief English.

Because "[t]here is no principle of superiors' liability, either in tort law or in the law of constitutional torts," *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988), Chief English cannot be held vicariously liable for the conduct of Lt. McCoy; none of the evidence shows that he "[knew] about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he] might see." *Id.* We must affirm, therefore, the dismissal of Sanders' complaint as it pertains to Chief English.

### Lt. McCoy: False Arrest

■ We must also affirm the dismissal of the false arrest claim against Lt. McCoy. Even construing the facts in a light most favorable to Sanders, nothing in the record suggests that Lt. McCoy's conduct leading up to Sanders' arrest was tortious. *See Millsap*, 862 F.2d at 1160 (plaintiff's arrest resulting from police negligence in misspelling suspect's name on materials submitted for indictment and warrant not actionable). Lt. McCoy did not mislead the judge who issued the warrant, *see Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) ("*Geter I*") (procuring false identification by unlawful means or deliberately concealing exculpatory evidence "violates clearly established constitutional principles"); nor did he act with "personal animosity, malice, and lack of good faith" in seeking the warrant. *See Thomas v. Sams*, 734 F.2d 185, 191 (5th Cir.) (defendant's malicious conduct constituted improper arrest), *amended*, 741 F.2d 783 (5th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

We are not persuaded that Lt. McCoy's use of an unconventional identification procedure alters the analysis. There is no evidence that Lt. McCoy was responsible for the seating arrangement in the packed courtroom, or that he suggested to Mr. Sandifer that Sanders was the culprit. Although we have held that the intentional use of unduly suggestive identification procedures can support a § 1983 action, *Geter v. Fortenberry*, 882 F.2d 167, 170 (5th Cir.

1989) ("*Geter II*") ("insisting that [witnesses] pick an individual from photo lineups, prodding the witnesses to select another picture when they had chosen incorrectly, and becoming hostile ... when a witness refused to cooperate"), this is not such a case.

Lt. McCoy undisputedly informed the issuing judge of all the facts known to him at the time; the exculpatory evidence came to Lt. McCoy's attention *after* the arrest. Thus, Sanders cannot claim that Lt. McCoy recklessly or intentionally omitted mention of material facts that were "clearly critical" to the probable cause determination. *See Hale v. Fish*, 899 F.2d 390, 400 & n. 3 (5th Cir.1990) (plaintiff proved constitutional violation by showing that affidavit supporting arrest warrant contained critical omissions that would have negated probable cause); *accord DeLoach v. Bevers*, 922 F.2d 618, 622–23 (10th Cir.1990) (same), *cert. denied*, — U.S. —, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991); *Olson v. Tyler*, 771 F.2d 277, 281 n. 5 (7th Cir.1985) (same). Nothing in this record suggests that "the deliberations of the [issuing judge] were in some way tainted by the actions of the defendant." *See Hand*, 838 F.2d at 1428. We find no basis, therefore, for imposing liability against Lt. McCoy for Sanders' arrest.

### Lt. McCoy: Illegal Detention

■ Quoting from *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979), the district court dismissed Sanders' cause of action for failure to investigate on the ground that "[a]n officer executing an arrest warrant is not required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or another such defense." The district court concluded that once Sanders was lawfully arrested (which he was), Lt. McCoy was under no obligation to embark on an investigation to clear Sanders of the charges.

In *Baker*, an arrestee, stopped for a routine traffic violation, was taken into custody by police when a warrant check revealed that he was wanted on other charges. As

it turned out, the officers arrested the wrong man, but did not learn that until three days later when they compared his appearance against a photograph of the wanted man. The police then released the still-incarcerated arrestee. He filed a § 1983 action, alleging that his three day confinement was unconstitutional because the officers had ignored his protestations of innocence. On appeal to our court from a directed verdict in favor of the sheriff, we reversed, holding that the arrestee had made out a prima facie case. *McCollan v. Tate*, 575 F.2d 509, 512–13 (5th Cir.1978). The Supreme Court disagreed. The Court held that the detention of a person arrested pursuant to a valid warrant for a period of three days did not amount to a cognizable constitutional harm. The Court rejected the arrestee's argument that the police were obligated to investigate his protestations of innocence or "perform an error-free investigation of such a claim." 99 S.Ct. at 2695. The Court stated explicitly, however, that "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty ... without due process of law.'" *Id.* The three day detention at issue in *Baker*, however, did not amount to such a deprivation.

In *Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir.1988), we reviewed a civil rights case filed by an arrestee who alleged that his incarceration for eight months was illegal because police officers failed to properly investigate a lead that would have conclusively proven his innocence. The facts of *Simmons* bear a striking similarity to the case presently before us. *Simmons*, like this case, involved an armed robbery in Louisiana. A deputy "saw a sketch of the robber noticing a resemblance to Simmons." *Id.* at 338. The deputy arranged a photo line-up, and three of the victims identified Simmons. Simmons was arrested and charged with the robbery.

Exculpatory evidence then surfaced. His fingerprints failed to match those on packages of cigarettes that the assailant had dropped in the course of the robbery. However, "[t]his information was not turned over to the district attorney's office." *Id.* Four months later, the police received a tip conveying detailed information about the robbery and implicating another man as the assailant. The police arranged for the victims to view a photo line-up that included the other suspect's photograph; none of the witnesses identified him and, therefore, the police rejected him as a suspect. The police neither arranged for a physical line-up with the suspect nor compared his fingerprints with those on the cigarette packages.

Another four months later, Simmons' counsel obtained statements implicating the other suspect. He gave that information to the district attorney's office, which immediately embarked upon a thorough investigation. A fingerprint comparison proved positive and one of the victims identified the suspect's voice in a physical line-up. *Id.* at 339. Simmons was then released, some eight months after his initial arrest.

He filed a § 1983 action for false imprisonment, arguing that:

> the failure of the [officers] to compare [the other suspect]'s fingerprints with those on the cigarette packages, and the failure to conduct a physical line-up combined with the failure to inform the district attorney's office that Simmons' fingerprints did not match those on the cigarette packages [violated his] rights as protected by § 1983.

*Id.* The district court entered summary judgment in favor of the police officers, and we affirmed, reasoning that:

> [w]ith the benefit of hindsight, it was an incorrect decision not to compare Robinson's fingerprints with those on the cigarette packages. The defendants, however, did take some action. Calcasieu Parish Sheriff's Office informed Westlake City Police of [the suspect]'s name. Westlake Police conducted a photo line-up with [the suspect]'s photo where the witnesses reassured them that Simmons was the assailant. At this point the Westlake Police had no reason to conduct a physical line-up. *Had a witness been*

*unsure of the identification, then some basis would have existed to proceed with further investigation.* The Westlake Police, therefore, did follow up on the tip. Although the investigation ... may not have been conducted as efficiently or as expediently as possible, *their conduct simply does not exceed the level of negligence.*

*Id.* (emphasis added). In essence, Simmons had no claim against the defendants because the evidence adduced for summary judgment purposes showed, at most, that the police officers were negligent in following up on the exonerative leads. No evidence demonstrated that any of the officers deliberately ignored exculpatory evidence or conducted a reckless investigation. We held, therefore, that summary judgment in favor of the defendants was appropriate.

In this case, unlike *Simmons,* the plaintiff has come forward with evidence which, if credited by the fact-finder, would establish that the defendant knowingly and willfully ignored substantial exculpatory evidence. A fact-finder reasonably could conclude that Lt. McCoy deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man: three alibi witnesses deemed credible by Lt. McCoy, a negative identification by one of the witnesses who helped compose the police sketch, and a belated identification by the victim under peculiar circumstances. Lt. McCoy's deliberate failure to disclose this undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983. *See Geter II,* 882 F.2d at 170–71 (deliberate concealment of exculpatory evidence violates clearly established constitutional principles); *Geter I,* 849 F.2d at 1559 (same); *accord DeLoach,* 922 F.2d at 621 (affirming jury verdict in favor of plaintiff when evidence established that police officer deliberately failed to disclose exculpatory opinion of a key medical expert).

We note that *Baker* imposes no impediment to Sanders' claim because the thrust of his contention is not that Lt. McCoy failed to take affirmative steps to investigate Sanders' innocence, but rather, that Lt. McCoy failed to release him even after he knew (or should have known) that Sanders had been misidentified. *See Gay v. Wall,* 761 F.2d 175, 178–79 (4th Cir.1985) (*Baker* does not preclude a cause of action under § 1983 premised on an officer's failure to release an arrestee once he learns of the arrestee's innocence); *cf. McConney v. City of Houston,* 863 F.2d 1180, 1185 (5th Cir.1989) (continued detention of warrantless arrestee on charge of public intoxication unconstitutional if police know that arrestee is in fact not intoxicated). It is no answer that Lt. McCoy could not have terminated the proceedings unilaterally once the wheels of the criminal justice system were already in motion. *See Goodwin v. Metts,* 885 F.2d 157, 162–63 (4th Cir.1989) (police officer could not "escape liability merely because he could not unilaterally have terminated the prosecution"), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990); *Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir.1988) (Posner, J.) (if "police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him"). Lt. McCoy deposed that his recommendation to the prosecuting attorney's office carries great weight in the prosecutor's decision to proceed or abandon a prosecution. Thus, a jury could find that if Lt. McCoy had disclosed the exculpatory evidence to the prosecuting attorney's office, Sanders would have been released and the charges against him dropped long before they were.

Lt. McCoy: Malicious Prosecution

The district court dismissed the malicious prosecution claim on the ground that Sanders failed to come forward with evidence from which a reasonable juror could infer malice on Lt. McCoy's part. Alternatively, the district court held that Sanders could not prove "causation" because alibi witness Elam spoke directly to the prosecuting attorney and, thus, "any malice on the part of the defendants would not have had any effect on the course of the prosecution."

Viewing the record in the light most favorable to Sanders, as we are constrained to do, we must disagree.

■■■ The constitutional right to be free from bad faith or malicious prosecution is "sufficient to support a damage judgment against state law enforcement officials under 42 U.S.C. § 1983," including police officers who have had input into the prosecutor's decision to initiate criminal proceedings against an individual. *Hand,* 838 F.2d at 1424. We have written that:

> [i]f, then, the Fourteenth Amendment imposes a duty on state prosecutors to charge only upon ascertaining probable cause, it follows that one acting under color of state authority ... can be liable for subverting the performance of that duty, as by maliciously tendering false information to the prosecutor which leads him to believe probable cause exists where there is none. Since this would violate federally guaranteed rights, it therefore can be grounds for a § 1983 action.

*Wheeler v. Cosden Oil and Chemical Co.,* 734 F.2d 254, 260 (5th Cir.), *modified but reaffirmed in relevant part,* 744 F.2d 1131 (5th Cir.1984). Deliberately concealing or deliberately failing to disclose exculpatory evidence, like "maliciously tendering false information," can, as under the circumstances here present, form the basis for an inference that a defendant police officer acted with malice in initiating and maintaining a prosecution. *See Goodwin,* 885 F.2d at 162 ("a police officer who withholds exculpatory information from the prosecutor can be found liable under both § 1983 and the common law" for malicious prosecution); *Jones,* 856 F.2d at 993 ("the jury could find that the defendants systematically concealed from the prosecutors, and misrepresented to them, facts highly material to—that is, facts likely to influence—the decision whether to prosecute Jones and *whether* (that decision having been made) *to continue prosecuting him* right up to and into the trial").

On nearly indistinguishable facts, the Fourth Circuit in *Goodwin* affirmed a jury verdict against a police officer for malicious prosecution under § 1983. The plaintiffs were arrested in connection with a break-in and charged with grand larceny. Between arraignment and trial, two discoveries cast doubt on whether probable cause still existed to believe that the plaintiffs had committed the crime. The police learned that the complaining witness had used a false name and address, and they could no longer locate him. More significantly, one of the officers, Officer Maxwell, discovered that another man had been arrested in a neighboring jurisdiction and had confessed to the crime for which the plaintiffs were charged. Although Maxwell added the name of the confessed suspect to the incident report involving the plaintiffs, he failed to inform his superior officers or the prosecuting attorney's office of the exonerative evidence. When he spoke to the prosecuting attorney before trial, Maxwell again failed to mention the confession. 885 F.2d at 169-60.

After the plaintiffs were acquitted on the criminal charges, they brought suit and obtained a jury verdict for malicious prosecution under § 1983 against Maxwell for failing to inform the prosecuting attorney of the exculpatory evidence. Upholding the jury verdict, the Fourth Circuit observed that:

> it was reasonable for the jury to find that, based upon [the] confession, Maxwell knew or should have known, by the time of the criminal trial, that [the plaintiffs] did not commit the break-in. Maxwell's insistence that [the] confession did not exculpate [the plaintiffs] was rejected by the jury based upon substantial evidence.... Viewed in the light most favorable to [the plaintiffs], the evidence supports the jury's finding that Maxwell lacked probable cause to believe they were guilty after he learned of [the complaining witness'] false statements and the [exculpating] confession.

*Id.* at 161. The court found sufficient evidence in the record which a fair minded jury could rely upon to find in favor of the plaintiffs on the malicious prosecution claim. We believe the same to be true here: a factual basis exists which would

support a finding that Lt. McCoy knew (or should have known) that probable cause was lacking.

Within two days of the arrest, Lt. McCoy knew that Mr. Sandifer's identification, the only thread of evidence tying Sanders to the crime, was controverted by credible exculpatory evidence. Yet he did nothing, despite his earlier assurances to the press that the investigation was only just beginning. Lt. McCoy's obvious intolerance for Elam's efforts to inform him of the exonerative evidence, his statement that he just "wasn't going to do anything to get the charges dropped," his self-serving efforts to propel himself into the spotlight with the press, and his admission that he would have investigated the alibi if Sanders had proffered one, all buttress the inference that Lt. McCoy acted with malice.

Although Lt. McCoy still insists that Mr. Sandifer correctly identified Sanders as the assailant, a fact-finder is entitled to discredit that testimony in favor of evidence, tendered by Sanders, suggesting otherwise. "[W]e have emphasized repeatedly that cases which turn on the moving party's state of mind are not well-suited for summary judgment," and, therefore, we "must be vigilant to draw *every* reasonable inference from the evidence in the record in a light most flattering to the nonmoving party." *International Shortstop*, 939 F.2d at 1266 (emphasis in original). We cannot resolve the factual dispute over Lt. McCoy's state of mind by way of summary judgment, but must defer instead to the fact-finder on this issue.

We similarly may not resolve by way of summary judgment the issue of causation because there is evidence in the record from which a jury could conclude that, had Lt. McCoy informed the prosecuting attorney of *all* of the exculpatory evidence, the charges against Sanders would have been dropped sooner than they were. We are not persuaded, for purposes of summary judgment, that because alibi witness Elam

spoke directly to Chief English and the prosecuting attorney, that Lt. McCoy's failure to inform the prosecuting attorney of the exculpatory evidence had no effect on the course of prosecution.

According to Lt. McCoy, the prosecuting attorney follows *his* recommendation in deciding whether to maintain a prosecution, not the recommendation of a stranger who offers exculpatory evidence. This statement assumes particular significance here because Lt. McCoy indicated that he knew the alibi witnesses personally and could attest to their credibility. In large measure, "[t]he medium [was] the message": [14] had Lt. McCoy alerted the prosecuting attorney to *all* of the evidence bearing on Sanders' innocence, including his knowledge that the alibi witnesses were credible, and candidly admitted that they did not have probable cause to proceed with the prosecution,[15] the prosecuting attorney might have abandoned the prosecution immediately. *See Goodwin*, 885 F.2d at 161 ("the jury reasonably could infer that, had the private prosecutor been told of the facts negating probable cause, he would have declined to prosecute, and the solicitor would have nol prossed the case.").

We hold that Sanders tendered sufficient evidence of malice and causation to overcome the motion for summary judgment on the malicious prosecution claim.

### CONCLUSION

By now it is plain that we must deflate some, but not all, of the trial court's holding. We do not mean to puncture the trial court's efforts: we recognize, of course, that summary judgment is necessary to insure smooth riding on the trail to justice. However, trial courts must apply the brakes before racing to judgment. On that path, we affirm the district court's decision to permit Chief English to bow out of the race at this early stage and similarly dismiss the false arrest claim against Lt. McCoy. But we must ask that the district

**14.** "The Medium is the Mesage" Marshall Herbert McLuhan, *Understanding Media* (1964) (title of first chapter).

**15.** That in fact there was no probable cause can be inferred from the grand jury's decision to

return a "no true bill" and the subsequent dismissal of the charges against Sanders.

court shift gears in this *tour de judgment.* The court must backpedal on Sanders' claims for illegal detention and malicious prosecution. We therefore remand this case so that the parties can coast to the finish line, where an audience of six will decide who shall don the yellow jersey.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.