# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 02-3841

GARY GAUGER,

Plaintiff-Appellant,

v.

BEVERLY HENDLE, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 99 C 50322—**Philip G. Reinhard**, Judge.

_____

ARGUED MAY 27, 2003—DECIDED OCTOBER 30, 2003

_____

Before BAUER, POSNER, and COFFEY, Circuit Judges.

POSNER, Circuit Judge. Gary Gauger appeals from the grant of summary judgment to the defendants, three McHenry County, Illinois, detectives whom he had sued under 42 U.S.C. § 1983 charging them in effect with having framed him. There are other defendants, but they needn't be discussed separately, as their lawyers do not argue that there is any difference among their clients so far as liability for the wrongs alleged by Gauger is concerned.

The facts are bizarre. In 1993, Gauger, a 40-year-old divorced organic farmer, was living on the farm of his elderly parents, with whom he had had various contretemps

because of his alcoholism (which had driven him to join Alcoholics Anonymous) and his planting of marijuana. Once, his father had been heard to say, Gauger had struck his mother, leaving bruises on her arm and neck. And she had told him that if he continued drinking he might have to leave the farm. According to Gauger, he last saw his parents alive at about 8:30 p.m. on Wednesday, April 7. He did not see them at all the next day, even though he had not expected them to be away from the farm. He had begun that morning to suspect they had left, because he noticed Fluffy the cat outside on a window ledge, wet and crabby, and thought his parents would have let Fluffy in by now were they at home. That night he noticed that his parents' cars were still in the barn where they were kept and he became worried, but he went to bed without either searching the farm or reporting his parents missing. The following morning two customers of his father's motorcycle shop (which was on the farm property) came by, and Gauger entered the shop with them and discovered his father's dead body. He called the police, and they searched and found the mother's dead body in another shop on the property, where she had sold rugs. Both victims had had their throats cut.

Because there were no signs of forced entry into either shop and also no signs of a struggle, the police suspected Gauger of being the murderer. They took him to the police station for questioning that continued, with bathroom and food breaks, for 18 hours. Although the detectives who conducted the interrogation did not handcuff, hit, or threaten Gauger, they shouted at him a few times and they lied to him, telling him falsely that they had found physical evidence at the crime scene that implicated him and that he had flunked the lie-detector test administered to him at his request during the interrogation (the results of the test had in fact been inconclusive). After the detectives showed him photographs of his parents' bodies with their throats cut,

Gauger said he would tell them how he would have murdered his parents though he didn't recall having done so. He sketched the hypothetical murders and later gave a more detailed account in which he explained how he had checked the knife in his pocket, come up behind his mother in the rug shop, cut her throat, "caught her [as she fell] because I didn't want her to get hurt," "covered her with blankets because I cared," then went to the motorcycle shop, and saw "my Dad . . . walking away from me . . . he wouldn't have heard me because he's hard of hearing . . . I cut his throat and let him fall." But he refused to sign a confession because he had "no memory of any of this." At one point in the interrogation he said to one of the detectives, "how can you be nice to me? I don't deserve it," and another time he told this detective flatly, "I killed my parents." Eventually he asked for a lawyer because he was worried that if his statements "were taken out of context it might be considered a confession," and at this point the questioning ceased. By his own acknowledgment he had made several flippant remarks during the interrogation, which struck the officers as suspicious, given what had happened to his parents.

The foregoing summary of the interrogation is Gauger's; the detectives' version differs in crucial respects. There was no recording or transcript of the interrogation, and of course no signed statement, and in their reports of the interrogation that were forwarded to the McHenry County prosecutor the detectives, while they did acknowledge Gauger's having told them that if he killed his parents he could not remember doing so, did not describe his account of the murders as having been hypothetical in character. The combination of his detailed account (with no suggestion of its being hypothetical rather than actual) and his statement (which he acknowledged) that "I killed my parents" created the impression in the minds of the detectives that he had confessed. We do not know which version of the interroga-

tion is the correct one but for purposes of this appeal, since it is from the grant of summary judgment in favor of the detectives, we assume that Gauger's is.

At his trial for murder he testified to his version of the interrogation and the detectives presumably testified consistently with the account in their reports, though this is uncertain because, curiously, the transcript of the criminal trial was not made a part of the record of this case. Gauger was convicted and sentenced to death but the trial judge later reduced his sentence to life imprisonment. That was in 1994. Two years later the Illinois Appellate Court reversed Gauger's conviction and ordered a new trial on the ground that the statements he had made during his interrogation were inadmissible because they had been the fruit of an unlawful arrest, for when the police took him in for questioning they did not have probable cause to believe him guilty of a crime. In the trial court he had also argued that the statements were coerced, but he did not appeal the rejection of that argument; nor does he attempt to resuscitate it here. Indeed he is explicit in "not claim[ing] that the detectives violated the Constitution by their conduct *during* the interrogation" (emphasis his), and so we need not decide whether his statements were coerced by the browbeating to which he was subjected over a period of many hours, rather than being voluntary. A mature person with a high school degree and some college, Gauger does not fit the profile of the type of suspect who can readily be coerced to make incriminating statements without beating or threats. See, e.g., *Davis v. North Carolina*, 384 U.S. 737, 742-52 (1966); *Gallegos v. Colorado*, 370 U.S. 49, 52-54 (1962); Welsh S. White, "False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions," 32 *Harv. Civ. Rts-Civ. Liberties L. Rev.* 105, 131 (1997).

Gauger was never retried. The charges against him were

dropped after members of the Outlaws motorcycle gang admitted murdering Gauger's parents; they were later convicted of a RICO offense in which the two murders were among the predicate acts. Although the motorcycle gangsters did not implicate Gauger in the murders, the absence of signs of forced entry or a struggle, together with Gauger's suspicious behavior and statements, the financial benefit to him of his parents' death (his share of their estate was several hundred thousand dollars), and his acknowledgment that members of the Outlaws motorcycle gang had been occasional customers of his father's motorcycle shop, has left a lingering suspicion that he was somehow complicit. But that suspicion plays no part in our consideration of his appeal.

Gauger contends that the detectives perjured themselves when they testified at his criminal trial, consistently we are assuming with their reports, about what he had said during the interrogation. But witnesses, including police officers testifying for the prosecution in a criminal trial, have absolute immunity from a damages suit based on their testimony. *Briscoe v. Lahue*, 460 U.S. 325, 345-56 (1983). There is an exception for "complaining witnesses"—the instigators of the prosecution—and it might embrace police officers who pushed aggressively for a prosecution, *Malley v. Briggs*, 475 U.S. 335, 340-41 (1986); *Cervantes v. Jones*, 188 F.3d 805, 809-10 (7th Cir. 1999), overruled on other grounds in *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001); *Curtis v. Bembenek*, 48 F.3d 281, 285-86 n. 5 (7th Cir. 1995); *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003); cf. *Kalina v. Fletcher*, 522 U.S. 118, 129-31 (1997), but Gauger does not argue that the exception is applicable. (Indeed, neither side discusses either absolute immunity or the complaining-witness exception.) No reported appellate case suggests that police reports are entitled to a similar privilege (we cannot find any reported appellate case on point, and only indirect

support in two appellate cases, *Scott v. Hern*, 216 F.3d 897, 911 (10th Cir. 2000), and *Landrigan v. City of Warwick*, 628 F.2d 736, 744-45 (1st Cir. 1980)), even when they are put into evidence—as they were not, however, in this case. The existence of such a privilege is implicitly rejected by the many decisions which hold that if police falsify their reports in a successful effort to persuade the prosecutors to prosecute a suspect, they have violated his civil rights and he can sue the police without worrying about immunity. *Mahoney v. Kesery*, 976 F.2d 1054, 1061 (7th Cir. 1992); *Jones v. City of Chicago*, 856 F.2d 985, 993-94 (7th Cir. 1988); *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 126, 129-30 (2d Cir. 1997); *Sanders v. English*, 950 F.2d 1152, 1162-64 (5th Cir. 1992); *Robinson v. Maruffi*, 895 F.2d 649, 655-56 (10th Cir. 1990). (The prosecutors cannot be sued; they have absolute immunity.)

Insofar as these decisions rest, as they mainly do, on treating malicious prosecution by state officers as a federal constitutional tort, their authority has been undermined in this circuit by the *Newsome* case, which we discuss later; but *Newsome* does not undermine their implicit rejection of a defense of privilege. Likewise a false-arrest claim, as distinct from a malicious-prosecution claim, that is based on false reports or testimony by the police does not encounter a *Newsome* problem and is not blocked by privilege. See *Kalina v. Fletcher*, *supra*, 522 U.S. at 129-31; *Vakilian v. Shaw*, *supra*, 335 F.3d at 516. This will become significant later.

The issue of privilege would be beside the point if Gauger would have been prosecuted even on his own version of the interrogation, for then there would be no causal relation between the false police reports and the prosecution. We think he probably would have been prosecuted anyway. The evidence against him, though thin, was not negligible. The absence of signs of forced entry or struggle, his history

of alcohol and drug abuse and altercations with his parents that included a beating of his elderly mother, the value of the farm and the personal property in it (he inherited several hundred thousand dollars when the farm was later sold, whereas his income from farming was negligible), the delay in reporting his parents missing, and Gauger's statements at the interrogation that even if his recollection of them was exact could well be interpreted to indicate consciousness of guilt, taken all together provided a basis for a prosecution. It is true that the statements he made at his interrogation were later held to be inadmissible as the fruit of a false arrest, but the prosecutors had not foreseen this when they decided to prosecute him.

However all that may be, the lead prosecutor's deposition testimony that he didn't think he would have taken the case to the grand jury had he not thought (mistakenly) that Gauger had confessed makes it uncertain whether Gauger would have been prosecuted had it not been for the allegedly false police reports.

All this might seem of no moment given our recent holding in *Newsome v. McCabe, supra,* that malicious prosecution is not a constitutional tort unless the state provides no remedy for malicious prosecution, which is not contended. But all we held is that there is no constitutional tort of malicious prosecution as such; we reserved the question whether and in what circumstances a case such as this (which is similar to *Newsome*) might be actionable under the Fourth Amendment as an unreasonable seizure. 256 F.3d at 750-51. When a defendant is arrested and jailed on the basis of probable cause to believe that he has committed a crime, and only later does police fraud enter the picture with the effect of perpetuating the seizure without good cause, there is a question not as yet authoritatively resolved whether the Fourth Amendment has been violated. Compare *Albright v.*

*Oliver*, 510 U.S. 266, 277-279 (1994) (Ginsburg, J., concurring), and *Wilson v. Spain*, 209 F.3d 713, 715-16 (8th Cir. 2000), with *Reed v. City of Chicago*, 77 F.3d 1049, 1051-54 (7th Cir. 1996); *Wilkins v. May*, 872 F.2d 190, 192-94 (7th Cir. 1989), and *Riley v. Dorton*, 115 F.3d 1159, 1161-64 (4th Cir. 1997) (en banc). The view of this court, expressed in *Reed* (as interpreted in *McCulloch v. Gadert*, 344 F.3d 655, 660-61 (7th Cir. 2003), and *Lee v. City of Chicago*, 330 F.3d 456, 463 n. 3 (7th Cir. 2003)) and *Wilkins*, is that the Fourth Amendment is inapplicable. *Reed* and *Wilkins* were decided before *Newsome*, however, and perhaps that decision will provoke a reexamination of the issue—it is shocking to think that a police frame-up which lands a person on death row is not a constitutional tort, though every false arrest made without probable cause is.

This case is different because the state court found that there was no probable cause to arrest Gauger. His incarceration resulted from the combination of a false arrest with (if his testimony is believed) a false account of his interrogation. If his testimony is believed, therefore, the seizure of his person was from the beginning to the end of his incarceration unreasonable, and shouldn't that bring the allegedly fraudulent account of his interrogation under the Fourth Amendment? We need not decide, for instead of basing his complaint about the police reports on the Fourth Amendment, Gauger argues that *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a due process case that entitles criminal defendants to be shown any exculpatory evidence (including evidence usable to impeach a prosecution witness) in the possession of the prosecutors, required the detectives to give truthful versions of Gauger's statements at the interrogation to the prosecutors to be forwarded to his counsel at his criminal trial.

We find the proposed extension of *Brady* difficult even to

understand. It implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence. Indeed the duty to disclose falls out, because Gauger knew what he had said at the interrogation. See *Buie v. McAdory*, 341 F.3d 623, 625-26 (7th Cir. 2003); *Fullwood v. Lee*, 290 F.3d 663, 685-86 (4th Cir. 2002); *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996); *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir. 1995); *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990). The problem was not that evidence useful to him was being concealed; the problem was that the detectives were giving false evidence. Gauger wants to make every false statement by a prosecution witness the basis for a civil rights suit, on the theory that by failing to correct the statement the prosecution deprived the defendant of *Brady* material, that is, the correction itself.

Gauger has one more string to his bow, however. Had it not been for his false arrest, he would not have made any incriminating statements (maybe—but we'll accept the contention for the sake of argument) and so he probably (we'll also assume) would not have been prosecuted. But even if he would have been prosecuted, a false arrest is an unreasonable seizure, prohibited by the Fourth Amendment (made applicable to state action by interpretation of the Fourteenth Amendment) and actionable under 42 U.S.C. § 1983. The district judge, however, on the authority of *Booker v. Ward*, 94 F.3d 1052 (7th Cir. 1996), held that Gauger's claim of false arrest was barred by the two-year statute of limitations applicable to Fourth Amendment complaints filed in Illinois. *Ashafa v. Chicago*, 146 F.3d 459, 461 (7th Cir. 1998). The judge was mistaken if Gauger's false-arrest claim did not arise until the charges against him were dropped in 1996, for that was within the two-year statute of limitations as extended by tolling agreements between him and the defendants made in 1997 and 1998.

A constitutional claim that if vindicated would undermine a state conviction cannot be filed until the conviction is nullified, even if the claimant is not seeking to get the conviction set aside. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). But *Booker* holds that since a false arrest is not a defense to criminal charges, e.g., *Copus v. City of Edgerton*, 151 F.3d 646, 648-49 (7th Cir. 1998), determining that an arrest violated the Fourth Amendment does not undermine the defendant's conviction and therefore the claim arises, and the statute of limitations begins to run, when the arrest is made. E.g., *Gonzalez v. Entress*, 133 F.3d 551, 552-53 (7th Cir. 1998); *Beck v. City of Muskogee Police Dept.*, 195 F.3d 553, 558-59 (10th Cir. 1999); *Montgomery v. De Simone*, 159 F.3d 120, 126 n. 5 (3d Cir. 1998). But that is in general, not in every case. See, besides the *Okoro* decisions discussed below, *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 899-900 (7th Cir. 2001); *Perez v. Sifel*, 57 F.3d 503, 505 (7th Cir. 1995) (per curiam); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998). *Snodderly* holds that "claims resembling malicious prosecution do not accrue until the prosecution has terminated in the plaintiff's favor, and . . . claims for unlawful arrests made on warrants are really claims for malicious prosecution." These are actually one point rather than two. A warrant is legal process, and so a complaint about conduct pursuant to it is a challenge to legal process and thus resembles malicious prosecution.

It is true that some cases say that "in *all* cases" of false arrest the plaintiff's claim can go forward before the conviction is nullified. E.g., *Copus v. City of Edgerton*, *supra*, 151 F.3d at 648 (emphasis added). Yet these dicta, which misled the Ninth Circuit in *Harvey v. Waldron*, 210 F.3d 1008, 1015 (9th Cir. 2000), into believing that our court *never* allows the filing of a false-arrest charge to be deferred until the plaintiff's conviction falls, are in tension with such

statements in the same opinions as that "we cannot say *with certainty* that success on Copus' § 1983 claim '*necessarily*' would impugn the validity of his conviction." *Copus v. City of Edgerton, supra*, 151 F.3d at 650 (emphasis added). The implication is that not always but sometimes a successful challenge to a false arrest can indeed impugn the validity of the plaintiff's conviction. What we have rejected is a rule that false-arrest and other Fourth Amendment claims are *always* premature while the plaintiff still faces criminal punishment. *Gonzalez v. Entress, supra*, 133 F.3d at 553-54.

Gauger made incriminating statements during the interrogation that followed his arrest. The Supreme Court held in *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963), that statements that are the fruit of a false arrest are inadmissible, see also *Taylor v. Alabama*, 457 U.S. 687, 689-93 (1982); *Brown v. Illinois*, 422 U.S. 590, 601-05 (1975), just as the Illinois Appellate Court determined when it held that Gauger had been arrested without probable cause and that therefore the statements he made in his interrogation could not be used in evidence against him. For Gauger to mount an attack based on 42 U.S.C. § 1983 on his arrest was implicitly to challenge the legality of his conviction, which rested crucially on the statements that he made to the police when he was questioned after being arrested. Earlier we said that he might well have been prosecuted even if his version of the interrogation had been accepted, because his version was incriminating though not as much so as the prosecutors' version. With no statement at all in evidence, however, he could not have been convicted of guilt of his parents' murder beyond a reasonable doubt; the other evidence—the lack of forced entry or signs of struggle, for example—was probative merely as corroboration of his statements construed as a confession or at least as damaging admissions. So when he showed that the statements were the product of a false arrest and hence were inadmissible at

his criminal trial, he successfully impugned the validity of his conviction, as the state implicitly conceded when it dropped the charges against him following the reversal of his conviction. And so until Gauger's conviction was nullified (as it was in effect when the charges against him were dropped), he could not file his false-arrest claim, and so that claim not time-barred.

This conclusion is bolstered by our twin *Okoro* cases, *Okoro v. Bohman*, 164 F.3d 1059, 1061 (7th Cir. 1999), and *Okoro v. Callaghan*, 324 F.3d 488 (7th Cir. 2003). Okoro was convicted of a drug offense on the basis of heroin found during a search of his home. The conviction was never reversed or otherwise nullified. Claiming that the police had stolen jewelry belonging to him during the search, he brought a federal civil rights suit. We held that the suit was barred by *Heck* because he insisted not only that the police had stolen his jewels but that they had lied in testifying that he had heroin. Thus, if he was believed, he should not have been convicted, because the heroin was essential to the conviction; and so his Fourth Amendment suit for the allegedly stolen jewelry was barred. See also *Covington v. City of New York*, 171 F.3d 117, 119-29 (2d Cir. 1999); *Hudson v. Hughes*, 98 F.3d 868, 872 (5th Cir. 1996); *Woods v. Candela*, 47 F.3d 545, 546 (2d Cir. 1995) (per curiam). Likewise here, if Gauger was falsely arrested and therefore the statements he made were inadmissible, there isn't enough other evidence to support the conviction.

It might be argued that Gauger could have sued right after his arrest, even if he might also have waited until his criminal conviction was thrown out. But we do not think that such a conclusion would be consistent with *Heck*. For he could not knock out the arrest without also (by virtue of *Wong Sun*) invalidating the use in evidence of his admissions, without which, as we have said, he could not be con-

victed. *Heck*, to repeat, says that a criminal defendant can't sue for damages for violation of his civil rights, if the ground of his suit is inconsistent with his conviction having been constitutional, until he gets the conviction thrown out.

We think that in these circumstances Gauger's false-arrest claim did not accrue until his conviction was reversed, and so it was not untimely; therefore this part of the judgment for the defendants must be vacated and the case remanded. Prudence dictates that we also vacate the dismissal of Gauger's supplemental state-law claim for false arrest and remand it for reconsideration; though it appears that the applicable statute of limitations for that claim is only one year, see 745 ILCS 10/8-101; *Luciano v. Waubonsee Community College*, 614 N.E.2d 904, 910 (Ill. App. 1993); *Henderson v. Bolanda*, 253 F.3d 928, 932 (7th Cir. 2001), that issue has not been briefed and we do not even know whether Illinois would apply the *Heck* doctrine as we would—or at all; for it is not bound to apply *Heck* to claims under Illinois law.

For guidance on remand, we consider briefly what damages Gauger can seek if he prevails on his false-arrest claim. It might seem as a matter of first principles that they would not be limited to the damages he sustained before he was formally charged, even though he has failed to make a case that his prosecution and ensuing imprisonment violated his federal rights. A successful tort plaintiff is entitled to all damages that are a foreseeable consequence of the tort, and we have said that this principle is equally applicable to constitutional torts, including false arrest. *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002). So one might think that Gauger's damages would include the damages that resulted from the incarceration that ensued from the train of events set in motion by the arrest. In *Heck*, however, the Supreme Court quoted W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 119, p. 888 (5th ed. 1984),

favorably for the proposition that "if there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more." 512 U.S. at 484. As explained in subsequent cases, notably *Hector v. Watt*, 235 F.3d 154, 157-61 (3d Cir. 2000), and *Townes v. City of New York*, 176 F.3d 138, 145-48 (2d Cir. 1999), the interest in not being prosecuted groundlessly is not an interest that the Fourth Amendment protects.

A basic principle of tort law, invoked by us most recently in *Carter v. United States*, 333 F.3d 791, 797 (7th Cir. 2003), is that liability is limited to the harm that the statute or common law doctrine that created the liability was intended to deter. That is why the plaintiff lost in *Gorris v. Scott*, (1873-74) L.R. 9 Ex. 125, 1874 WL 16154 (1874), the hardy perennial that we cited in *Carter*. The plaintiff's animals, while being transported on the defendant's ship, were washed overboard and drowned when a storm struck it. The ship was not equipped with pens required by a statute to prevent the spread of disease among the animals. Had there been pens, the animals would have been saved. The suit for their loss was based on the violation of the statute but failed anyway because the statute was not aimed at preventing animals from being washed overboard. It is the same here: the Fourth Amendment is aimed at deterring unreasonable searches and seizures, not malicious prosecutions. Therefore Gauger's damages will be limited to the harm that he incurred from the false arrest before he was charged.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*