Owen GREEN, Plaintiff,

v.

CITY OF PATERSON, Detective Timothy Jordan, Detective Ador Flores, Detective Gloria McMillan, individually and as a police officer for the City of Paterson, John Does 1–10 unknown police officers for City of Paterson, Defendants.

Civil Action No. 95–6028(AJL).

United States District Court, D. New Jersey.

June 26, 1997.

Jack Arseneault, Karen Spano, Arseneault & Krovatin Chatham, NJ, for Plaintiff.

William T. Connell, Dwyer, Connell & Lisbona, Montclair, NJ, for Defendants.

LECHNER, District Judge.

This is a civil rights action brought by plaintiff, Owen Green ("Green") against Detective Timothy Jordan ("Jordan"), Detective Ador Flores ("Flores") (together, the "Detectives"), Detective Gloria McMillan ("McMillan") and the City of Paterson ("City of Paterson"), (collectively, the "Defendants"). Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

Green alleges his constitutional rights were violated when he was wrongfully arrested by the Defendants. Green filed a seven count complaint ("Complaint") asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983"),[1] as well as various state law causes of action. Green seeks compensatory and punitive damages, attorney's fees and any further relief deemed appropriate. Complaint, ¶ 44.

The Defendants filed a motion for summary judgment ("Motion for Summary Judgment") pursuant to Rule 7.1(f), formally Rule 12N, of the Local Rules for the District of New Jersey.[2] For the reasons set forth below, the Motion for Summary Judgment is granted.

---

1. The Complaint also set forth claims pursuant to 42 U.S.C. § 1985 ("Section 1985"). On 19 July 1996, the parties stipulated to dismissal with prejudice of all claims raised pursuant to Section 1985.

2. In support of the Motion for Summary Judgment, the Defendants submitted: Defendants' Brief in Support of Summary Judgment ("Moving Brief"); Certification of William T. Connell ("Connell Cert."), with Exhibits A through LL attached; Defendants' Reply Letter Brief ("Reply Brief").

In opposition to the Motion for Summary Judgment, Green submitted: Plaintiff's Brief in Opposition to Summary Judgment ("Opposition Brief"); Certification of Jack Arseneault ("Arseneault Cert."), with Exhibits A through S attached.

*Facts*

A. *Parties*

1. *Plaintiff*

Green is a citizen of the State of New Jersey residing in the City of Paterson. *See* Complaint, ¶ 3.

2. *Defendants*

Detectives Jordan, Flores and McMillan are residents of the state of New Jersey and are agents, servants and/or employees of City of Paterson. *Id.*, ¶ 5. At all relevant times, Jordan, Flores and McMillan were acting pursuant to and under color of state law. *Id.*

The City of Paterson is a body corporate and politic organized under the laws of the state of New Jersey. *Id.*, ¶ 4. The City of Paterson owns, manages, directs and controls the Paterson Police Department. *Id.*

B. *Background*

1. *Before the Shooting*

On the evening of 20 November 1994, Green was attending church services. *See* Plaintiff's Answers to Defendant's Interrogatories ("Plaintiff's Interrogatory Answers"), attached to Arseneault Cert. as Exhibit A, at 1. Following services, at approximately 10:00 p.m., Green drove another church parishioner, Violet Ramnan ("Ramnan"), to her residence on 25th Avenue in the City of Paterson. *Id.* After dropping Ramnan at her residence, Green proceeded to his home. *Id.* He drove down 15th Street, turned right on East 18th Street then turned left on Van Houten Street, where he stopped at a red light at its intersection with Main Street. Deposition of Green ("Green Dep."), attached to Arseneault Cert. as Exhibit J, 28–30.

2. *The Shooting*

At approximately 10:27 p.m. on the same date, a shooting occurred at 174 12th Avenue in the City of Paterson. Voluntary Statement of David Allen Carlswell ("Carlswell Statement"), attached to Arseneault Cert. as Exhibit D, at 1. Two witnesses, David Allen Carlswell ("Carlswell") and Alton Fitts ("Fitts"), were playing basketball with some friends in a playground on 12th Avenue. Voluntary Statement of Fitts ("Fitts Statement"), attached to Arseneault Cert. at Exhibit E, 1. They heard a gunshot and then observed a black man push a black female, later determined to be Arlene Session ("Session"), out of a car. *Id.* Fitts ran to the fence in the front of the playground to view the license plate number of the vehicle. *Id.* Fitts was unable to see the license plate but was able to get "a good look" at the driver. *Id.*

Carlswell and Fitts jumped into Carlswell's car, a red Audi, in an attempt to follow the vehicle to obtain a license plate number. *Id.* at 2. The two witnesses drove down 12th Avenue, made a right onto East 16th Street and another right onto East 18th Street. Once on East 18th Street, the car they were following ran a red light at the intersection of East 18th Street and Broadway and then turned right onto Van Houten Street. *Id.* It was at the intersection of Van Houten Street and Main Street that the two witnesses pulled along side the vehicle and viewed the driver. *Id.* The two witnesses stated they never lost sight of the car except when it made a turn. Voluntary Statement of Fitts ("Fitts Statement"), attached to Arseneault Cert. as Exhibit E, at 2.

While at the stoplight, Green noticed two men in a red car pointing at him. Plaintiff's Interrogatory Answers at 1. In fear of his safety, Green continued to drive while the red car followed. *Id.* at 2. After several turns, the red Audi stopped following Green and Green continued home. *Id* at 2. Carlswell and Fitts returned to the crime scene to report the license plate number to the police. Fitts Statement at 2.

3. *The Investigation*

At approximately 10:33 p.m., Paterson Police Patrolmen Richard Fletcher ("Fletcher"), Randy Billie ("Billie"), and Patrol Sergeant Alexander DeLuccia ("DeLuccia") were dispatched to 174 12th Avenue. Upon arrival, the officers found Session lying on the sidewalk. *See* Offense Report prepared by Billie ("Billie Report"), attached to Connell Cert. as Exhibit B, at 1; Official Report of DeLuc-

cia ("DeLuccia Report"), attached to Connell Cert. as Exhibit A, 1. At 10:45 p.m., Jordan and Flores responded to the crime scene. *See* Supplemental Police Report ("Supplemental Police Report"), attached to Arseneault Cert. as Exhibit B, at 1–2. They were advised by the other officers that a black female had been shot in the head while in a car and pushed out the passenger door by a black male. They were also informed two witnesses gave the license plate number of the car which they believed the suspect was driving—a 1982 four door silver Volkswagen registered to Yvonne Green of 30 Ryerson Avenue in the City of Paterson (the "Y. Green Vehicle"). *Id.* The victim had been transported to St. Joseph's Hospital before Jordan and Flores arrived. *Id.*

Jordan and Flores left the crime scene at approximately 11:00 p.m. for St. Joseph's Hospital. Deposition of Flores ("Flores Dep."), attached to Connell Cert. as Exhibit H, attached to Arseneault Cert. as Exhibit K, at 22, 25. The attending nurse indicated Session had been communicating by blinking her eyes—one blink for yes, two blinks for no. Deposition of Jordan ("Jordan Dep."), attached to Connell Cert. as Exhibit I, attached to Arseneault Cert. as Exhibit L, 141. Jordan asked Session if she knew the individual who shot her; Session blinked once for yes. *Id.* Jordan then asked Session whether the suspect was Ian Green, a major drug dealer in the City of Paterson area; Session blinked twice for no. *Id.* Jordan and Flores were unable to question Session further due to her medical condition. *Id.*

At approximately 11:30 p.m., Flores and Jordan proceeded to 30 Ryerson Avenue in search of the suspect vehicle. Supplemental Police Report at 3. They located a gray four door Volkswagen with a New Jersey license plate FX912P in front of 21 Ryerson Avenue. *Id.* Jordan and Flores observed the engine of the car was warm. *Id.* They looked inside the vehicle and did not see any blood, bullet holes or bullet casings. Flores Dep. at 40–41. Jordan and Flores radioed the Detective Bureau and requested the two witnesses who had chased the vehicle, later determined to be Carlswell and Fitts, be transported to Ryerson Street for a vehicle identification. Supplemental Police Report at 3; Flores Dep. at 41. Detective Carl Popewiny ("Popewiny") transported Fitts and Carlswell to Ryerson Avenue where they identified the Y. Green Vehicle as the suspect vehicle. *Id.*

Popewiny joined Jordan and Flores outside of 30 Ryerson Avenue. Deposition of Popewiny ("Popewiny Dep."), attached to Connell Cert. as Exhibit O, attached to Arseneault Cert. as Exhibit N, 14. Jordan and Flores asked Popewiny to watch outside the house. *Id.* at 15. Jordan and Flores knocked on the door, which was answered by the wife of Green, Yvonne Green ("Yvonne Green"). Supplemental Police Report at 4. Moments later, Green came to the door. *Id.* Green told Jordan and Flores he drove the Y. Green Vehicle that evening and that "two guys were following [him] downtown." *Id.* Deposition of Green ("Green Dep."), attached to Connell Cert. as Exhibit Q, attached to Arseneault Cert. as Exhibit J, 45. Jordan and Flores responded that Green had to "come downtown" with them. Green Dep. at 45. Green repeated that "two guys were following me downtown." *Id.*[3]

While Green went to his bedroom to dress, he overheard Yvonne Green tell Jordan and Flores of the two men who were following Green that evening. *Id.* at 48. One of the Detectives asked Yvonne Green for the keys to the Y. Green Vehicle. *Id.* The officer returned the key and advised they did not open the car. *Id.* at 56. Green, who was

---

**3.** Green argues in his opposition brief that there is a genuine issue of material fact as to whether the Detectives, upon arrival at the Green residence, told Green about the shooting and that he had been identified as the suspect. Opposition Brief at 12 (citing Green Dep. at 46). The Supplemental Police Report indicates Jordan and Flores explained they were investigating a shooting incident which had just occurred. *See* Supplemental Police Report at 4. The cited deposition indicates Green could not recall specifically what the Detectives were telling him at his residence. Green Dep. at 47. Even assuming Green was not advised of the shooting, it does not change the decision reached in this opinion. Green does not explain how this is a genuine issue of material fact "impacting the basis for the [D]efendants' probable cause determination." Opposition Brief at 12.

never handcuffed, was taken to police headquarters. *Id.* at 52.

During this period Carlswell and Fitts had been sitting in the back seat of the Popewiny's vehicle parked on Ryerson Avenue. Popewiny Dep. at 14. Carlswell and Fitts viewed and identified Green to Popewiny as "the guy" who committed the shooting. *Id.* at 16–17. Popewiny had not asked either Carlswell or Fitts to identify Green; rather it was offered by the two witnesses voluntarily. *Id.* at 35. Popewiny informed Jordan and Flores of the identification by radio. *Id.* at 17.

### 4. *At the Detective Bureau*

At approximately 12:10 a.m. on 21 November 1994 in the Detective Bureau, Green signed a *Miranda* Form and was placed in an interview room. *See* Supplemental Police Report, 4; Signed *Miranda* Form, attached to Connell Cert. as Exhibit S. Green, Carlswell and Fitts were interviewed. Deposition of Jordan ("Jordan Dep."), attached to Connell Cert. as Exhibit I, 177.

During his interview, Green explained he had been at church that evening. Supplemental Police Report at 5. On his way home he dropped off another parishioner, Ramnan. Thereafter, while at the intersection of Main Street and Van Houten Street, a red car occupied by two black males pulled up along side of the Y. Green Vehicle and were pointing at him. Green said he became frightened, drove off and went home. *Id.* Green offered that Flores could search the Y. Green Vehicle. Green Dep. at 72. In addition, Green provided the address and telephone number of Ramnan, *id.*, and submitted to a paraffin test for traces of gun powder. *Id.* at 89. No written statement from Green was taken because it was "not going to help [the] case." Deposition of Sergeant Raymond Reid ("Reid Dep."), attached to Connell Cert. as Exhibit D, 62; Flores Dep. at 94.

Carlswell and Fitts were interviewed separately. Flores Dep. at 76. Both witnesses provided similar information. *Id.* at 75–76, 81. While they were playing basketball in the park, Carlswell and Fitts heard a shot and then observed Session being pushed from a car. *Id.* The witnesses attempted to read the license plate number of the car but could not do so because it pulled away. *Id.* They followed the vehicle in Carlswell's Audi. They were able to pull along side the car, view the driver, and obtain the license plate number. *Id.* at 77. Both witnesses stated they never lost sight of the vehicle during the chase. *Id.* at 81. Fitts indicated he had seen Green before in the area of the shooting buying drugs. Jordan Dep. at 180–81.

Carlswell and Fitts identified Green from a single photo taken of Green at the Detective Bureau. Jordan Dep.. at 157. Both Carlswell and Fitts provided sworn written statements. *See* Fitts Statement; Carlswell Statement. McMillan took the statement of Carlswell while Jordan took the statement of Fitts. *Id.* Although three additional witnesses at the crime scene saw a black male push Session out of the car, none of these witnesses could identify the car or driver. *See* Supplemental Police Report at 6. The Detectives did not take statements from these witnesses.

Sergeant Raymond Reid ("Reid") made a decision to show Session a single photograph of Green for identification. Reid Dep. at 54. Reid considered this procedure to be reasonable. *Id.* at 54–55. Popewiny took a photograph of Green to Session. Popewiny Dep. at 20. A nurse advised Popewiny that Session was paralyzed and not able to speak, but could respond by blinking to yes and no response questions. *Id.* at 22–23. Session blinked yes to the questions of whether she was well enough to make an identification, whether the person who shot her was male, and whether the person who shot her was Green, the person in the photograph. *Id.* at 25–26. The nurse corroborated that Session responded yes to the questions. *Id.* at 27. Popewiny informed Reid of the identification. *Id.*

### 5. *The Arrest*

Green was arrested and charged with the shooting of Session on 21 November 1994 at 12:50 a.m. *See* Arrest Report, attached at Connell Cert. as Exhibit W. Prior to the arrest, Jordan, Flores and Reid discussed the evidence and agreed there was probable

cause for the arrest. *See* Jordan Dep. at 190–91. Green was transferred from the Detective Bureau to the cell block of the Paterson Police Department. Arrest Brief, attached to Connell Cert. as Exhibit X.

Green was arraigned on 21 November 1994 by Paterson Municipal Court Judge DelaCarrea, who referred the issuance of bail to the Bail Unit of the Passaic County Superior Court. Passaic County Jail Admittance Form, attached to Connell Cert. as Exhibit AA. Bail was set at $100,000 on 23 November 1994 by Passaic County Superior Court Judge Subryan. Bail Notice, attached to Connell Cert. as Exhibit BB. Green was released on bail on 28 November 1994. Plaintiff's Interrogatory Answers at 2.

### 6. *Post–Arrest Investigation*

Between 21 November 1994 and 2 February 1994 the Detectives continued to conduct their investigation. *See* Supplemental Police Report Update ("Supplemental Police Report Update"), attached to Arseneault Cert. as Exhibit C., 1. On 21 November 1994, Flores responded to St. Joseph's Hospital to retrieve the clothing of Session but was informed it had been discarded. *Id.* On that date, Flores obtained a sworn statement from Ramnan, *id.,* and returned to St. Joseph's Hospital to speak with Session, but was unable to do so because of her physical condition. *Id.*

On 22 November 1994, Jordan and Flores went to investigate the residence of Session.[4] *Id.* Caroline Merritt ("Merritt") confirmed Session lived at the residence and informed Jordan and Flores that Session was using drugs and selling drugs to support her habit. *Id.* at 3. Merritt was shown a photograph of Green, who indicated she had not seen him before. *Id.*

On 23 November 1994, Jordan and Flores obtained a search warrant for the Y. Green Vehicle. The Y. Green Vehicle was towed to the State Police Crime Scene Unit in Totowa, New Jersey. A search of the Y. Green Vehicle was conducted. No blood stains or shell casings were found. *Id.*

Following the search of the Y. Green Vehicle, Jordan and Flores spoke with two individuals at the North Jersey Developmental Center, Green's place of employment. Robert C. Lowe II ("Lowe"), the Administrative Director, and David Dohrman ("Dohrman"), the immediate supervisor, stated they were surprised Green was "involved in such a heinous crime" and described Green as hard working and responsible. *Id.* Lowe and Dohrman had no record of Session ever working as an employee at the North Jersey Developmental Center. *Id.*

Jordan and Flores went to St. Joseph's Hospital where they presented six photographs of black males to Session, including a photo of Green. *Id.* at 4. Session was unable to identify any of the photos in the line-up. *Id.* Jordan, Flores and another detective, Richard Reyes ("Reyes") attempted to re-enact the actions taken by the two witnesses but were unable to follow the suspect vehicle, obtain the license plate or observe the driver as he passed the playground. *Id.* Only when the suspect vehicle was driving approximately fifteen to twenty miles per hour were the Detectives able to catch up to the suspect vehicle. *Id.* On 28 November 1994, Jordan and Flores attempted to interview Session again, but were unable to due to her physical condition. *Id.* at 5.

On 30 November 1994, Jordan and Flores canvassed the area of the crime scene with a photo of Green attempting to determine if anyone knew Green. After speaking with numerous individuals, they were unable to find anyone that was familiar with him. *Id.* Jordan and Flores conducted a search of the Green residence, but found no evidence pertaining to the shooting. *Id.*

Based on the following, Jordan and Flores began to have suspicions as to whether Green was responsible for the shooting:

1) no evidence of the shooting was found in the Y. Green Vehicle;

2) the re-enactment of the crime scene demonstrated that it was unlikely the witnesses were able to follow the suspect vehicle without losing sight of it;

---

4. Jordan and Flores were advised of Session's residence by William James, with whom they spoke on the night of the shooting. Supplemental Police Report Update, 1.

3) the personal background of Green gathered from his employment history and lack of criminal history;

4) the inability of Session to identify Green from a line-up;

5) the canvassing of the area which demonstrated people in the area of the shooting were unfamiliar with Green;

6) there was no apparent relationship between Session and Green; and

7) the short duration of time between when Green dropped off Ramnan and the time of the shooting;

*Id.* at 5–6.

Further investigation led to the arrest of Bently Linton[5] ("Linton") on 25 January 1995 for the shooting of Session. *Id.* 6–14. The day following the Linton arrest, Purdy announced at a news conference that all charges against Green would be dismissed. *See* Stipulation of Facts, attached to Connell Cert. as Exhibit GG. The charges were dismissed on 5 April 1995 pursuant to a motion to dismiss. *Id.* Green filed the instant Complaint on 28 November 1995.

*Discussion*

### A. Standard of Review for Summary Judgment Motions

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [they are] entitled, to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether genuine issues of material fact exist and whether the Defendants are entitled to judgment as a matter of law.

A district court may not resolve factual disputes in a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir.1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' ") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party' ") (citations omitted). The existence of some factual dispute between the parties, however, will not defeat a properly supported motion for summary judgment. Rather, the factual dispute must involve material facts, facts which might affect the outcome of the suit. *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir.1995). *See also Hampton v. Borough of Tinton Falls Police Dept.,* 98 F.3d 107, 112 (3d Cir.1996) (party opposing summary judgment must present sufficient evidence for a reasonable jury to find in its favor by demonstrating a dispute over facts that might affect the outcome of the suit) (citations omitted); *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

In considering a motion for summary,judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Kneipp v. Tedder,* 95 F.3d 1199 n. 1 (3d Cir.1996); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 & n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). When the resolution of issues depends wholly upon the interpretation of the

---

**5.** Linton is the same gender, race and nationality as Green. Both men are also close in age; Linton is 36 years old and Green is 42 years old.

*Compare* Green Dep. 3–5 and Police Supplemental Report Update at 9.

applicable law, summary judgment is appropriate. *See DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 724 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert v. United States*, 925 F.Supp. 261, 265 (D.N.J.1996).

## B. *Standard under Section 1983*

■ To prevail in a Section 1983 action, a plaintiff must establish (1) that the conduct constituted state action or action committed while acting under color of law and (2) that the conduct deprived an individual of rights, privileges, or immunities secured by the constitution or laws of the United States. *Kneipp*, 95 F.3d at 1204; *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1264 (3d Cir.1994); *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990). *See also Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981) (citing same two elements "essential elements to a § 1983 action"), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978); *Jackson v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, 721 F.2d 931, 933 (3d Cir.1983); *McArdle v. Tronetti*, 769 F.Supp. 188, 190 (W.D.Pa.1991), *aff'd*, 961 F.2d 1083 (1992). Section 1983 does not create substantive rights. Rather, Section 1983 provides an avenue of recovery for the deprivation of established constitutional or statutory rights. *Kneipp*, 95 F.3d at 1204; *Groman*, 47 F.3d at 633.

### 1. *Probable Cause to Arrest*

"[T]he Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause." *Orsatti*, 71 F.3d at 482 (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)). Probable cause to arrest exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Id.* at 483; *United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir.1990) (citation omitted), *cert. denied*, 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991); *United States v. Massac*, 867 F.2d 174, 175 (3d Cir.1989). *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964)

■ The validity of an arrest does not depend on the ultimate finding of guilt or innocence following an arrest. *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967), *overruled on other grounds, Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It is not the obligation of the police officer to "conduct a mini-trial" prior to an arrest. *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 179, 136 L.Ed.2d 119 (1996); *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir.1994) ("Evidence that may prove insufficient to establish guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law.") (citing *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959)). *See also Baker v. McCollan*, 443 U.S. 137, 145–46, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979) ("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim."). Probable cause falls somewhere between the poles of mere suspicion and evidence sufficient to prove guilt beyond a reasonable doubt. *Orsatti*, 71 F.3d at 482–83.

■ A police officer who arrests an individual without probable cause may be liable for damages in a civil rights suit. *Id.; Barna*, 42 F.3d at 819. Police officers, like other governmental officials, are protected from liability for civil damages where their conduct in performing a discretionary function

"does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Orsatti*, 71 F.3d at 483 (citing *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738). *See also Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991); *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Sherwood v. Mulvihill et al.*, 113 F.3d 396, 399 (3d Cir.1997); *Grant v. City of Pittsburgh*, 98 F.3d 116, 121–22 (3d Cir.1996); *In re City of Philadelphia Litigation*, 49 F.3d 945, 961 (3d Cir.), *cert. denied*, — U.S.——, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995); *Rowe v. Romano*, 940 F.Supp. 798, 802 (E.D.Pa.1996).

 Qualified immunity exists when "a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). Immunity will not protect an officer where an objective analysis reveals that no reasonable officer would have concluded that a warrant should issue. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Karnes v. Skrutski*, 62 F.3d 485, 492 & n. 3 (3d Cir. 1995) ("There is no conflict in saying a police officer who acted unreasonably nevertheless reasonably (but mistakenly) believed his conduct was reasonable"). The qualified immunity doctrine provides ample room for mistakes in judgment and protects "all but the plainly incompetent or those who knowingly violate the law." *Orsatti*, 71 F.3d at 484. *See Hunter*, 502 U.S. at 227, 112 S.Ct. at 536; *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096.

The rationale behind qualified immunity for police officers is twofold—to permit officers to perform their duties "without the fear of constantly defending themselves against insubstantial claims for damages" and to allow the public to recover damages where officers "unreasonably invade or violate individual rights under the Constitution and the laws of the United States." *Orsatti*, 71 F.3d at 483 (citing *Anderson v. Creighton*, 483 U.S. at 639, 107 S.Ct. at 3038–39). Although probable cause is generally a factual question, *see Deary v. Three Un–Named Po-* *lice Officers*, 746 F.2d 185, 191 (3d Cir.1984), summary judgment may be granted in an appropriate case where there is no room for a difference of opinion that probable cause existed. *See Groman*, 47 F.3d at 635. As well, when material facts are not in dispute, the determination of whether an officer is cloaked in qualified immunity may be decided as a matter of law. *Orsatti*, 71 F.3d at 483.

"Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing the defendant's conduct violated some clearly established statutory or constitutional right." *Sherwood*, 113 F.3d at 399 (citations omitted). Once the plaintiff's burden is met, the defendant must show that no genuine issue of material fact remains as to the objective reasonableness of the lawfulness of his or her actions. *Id.*

 "[F]or Fourth Amendment purposes, the issue is not whether the information on which police officers base their [arrest] resulted from a professionally executed investigation; rather, the issue is whether that information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti*, 71 F.3d at 484; *Groman*, 47 F.3d at 634 ("The proper inquiry . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense.") (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir.1988)). The focus is upon the information the Detectives had available to them at the time, "not on whether the information resulted from exemplary police work." *Orsatti*, 71 F.3d at 484; *see also Barna*, 42 F.3d at 819.

 In the Second Count of the Complaint, Green alleges his arrest was wrongful and constituted an unlawful seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution. Complaint, ¶¶ 21–23. Based upon the undisputed material facts presented by the parties, Jordan and Flores had probable cause to believe a crime had been committed by Green. Because their actions did not violate

any constitutional rights and were objectively reasonable, Jordan and Flores are protected from liability by qualified immunity.

The evidence submitted indicates Jordan and Flores had a sufficient basis in probable cause to believe a crime had been committed and Green was the individual who shot Session. Information provided by two witnesses, Carlswell and Fitts, the victim, Session, and the suspect, Green, provided a basis in probable cause for the arrest.

The voluntary and independent statements given Carlswell and Fitts corroborated one another. Carlswell and Fitts claimed they were playing basketball in a neighborhood playground when they heard a gunshot and observed a black, older male push a black female out of a blue or gray vehicle. *See* Carlswell Statement. Carlswell and Fitts ran to the fence of the playground to view the license plate number of the vehicle. Although he could not see the license plate, Fitts stated he "got a good look at" the driver. *See* Fitts Statement.

The two jumped into Carlswell's car and began to chase the vehicle. *Id.* Fitts indicated "[they] never lost sight of the [vehicle] except when it made a turn. No other car ever got between [them] ." *Id.* Carlswell and Fitts eventually pulled alongside of the vehicle and were able to view the driver. *Id.* They obtained the license plate number and returned to the crime scene, where they relayed the license plate number to Billie. *Id.*

At the request of Jordan and Flores, Carlswell and Fitts were taken to Ryerson Avenue where they identified the Y. Green Vehicle as the vehicle they had pursued. While on Ryerson Avenue, Carlswell and Fitts saw Green leaving his home for the Detective Bureau, accompanied by Jordan and Flores. Carlswell and Fitts identified Green "as the man who [they] saw push [Session] out of the car." *See* Carlswell Statement. This identification was transmitted by radio to Jordan and Flores. Popewiny Dep. at 16–17. Thereafter, between midnight and 1:00 a.m. on 21 November 1994, Carlswell and Fitts identified Green a second time from a photograph at the Detective Bureau during their separate interviews. See Carlswell Statement; Fitts Statement.

The information provided by Carlswell and Fitts was corroborated, to some extent, by Green. Green told the Detectives he had been driving in the area at the time of the shooting and two men had been following him. Supplemental Police Report at 5. Assuming Green had transported Ramnan to her home at 10:10 p.m., Green had the opportunity to commit the shooting, which had occurred at approximately 10:27 p.m., in a location near the residence of Ramnan. Jordan Dep. at 230, 235. The Detectives stated it was their experience for a perpetrator to acknowledge being in the area of a crime, but deny involvement in the crime. *Id.* at 176.

Further, the Detectives had the identification of Green by Session, the victim. Shortly after the shooting, Jordan and Flores responded to St. Joseph's Hospital where they asked Session if she knew the individual who shot her. Supplemental Police Report at 3. Session indicated she did. *Id.* At approximately 12:15 a.m. on 21 November 1995, Popewiny took a single photo of Green to Session at St. Joseph's Hospital. *Id.* at 5. At the time, Session was conscious and responsive. Session indicated by blinking her eyes that Green was the individual who shot her. *Id.* at 5. The nurse on duty confirmed the identification by Session to the photograph was positive. *Id.*

Green argues summary judgment is not proper in this case because the parties' law enforcement experts disagree as to the reasonableness and propriety of the actions of the Defendants. Green argues genuine issues of material fact exist regarding the Defendants actions, including the assessment of probable cause to arrest. Specifically, Green contends the Defendants did not base their decision to arrest Green on reliable, trustworthy information and did not conduct a proper investigation. In support of his argument, Green offers an expert report (the "Propsner Report") from John Propsner ("Propsner"), who "has opined that the [D]efendants' actions in arresting [Green] were unreasonable and in violation of his constitutional rights." Opposition Brief at 10.

#### a. *Identifications*

Green submits the Propsner Report for the conclusion that the probable cause to

arrest Green was based upon three tainted identifications. *Id.* The Propsner Report suggests 1) the on-scene identification by Carlswell and Fitts violated Paterson Police Procedure 108.1 ("Procedure 108.1") Section III A ("Section III A"),[6] 2) the photo identification by Carlswell and Fitts violated Procedure 108.1 Section I—("Section I")[7] and 3) the photo identification by Session violated Section I.

Because the Defendants' expert, Joseph Craparotta ("Craparotta") concluded the Defendants had probable cause to arrest Green, Green argues "the mere dispute as to the reasonableness and appropriateness of the [D]efendants' actions in assessing probable cause and arresting [Green] creates a genuine issue of material fact to be determined by a jury and compels denial of summary judgment." Opposition Brief at 11.

The Propsner Report, however, never reaches the issue of whether sufficient probable cause existed for the arrest. Rather, the Propsner Report states:

> The conclusion is that the probable cause that the Detectives based their decision on to arrest [Green] for this crime is based on three tainted identifications. Identifications that are all conducted in violation of [Procedure 108.1].

*See* Propsner Report, attached to Arseneault Cert. as Exhibit O. The sole basis for the conclusion that the three identifications were tainted was because they violated Procedure 108.1. Violation of a police department procedure, however, does not necessarily infringe upon a constitutional right giving rise to a Section 1983 claim. Rather, to be actionable, the conduct must violate a right which is created by Federal statutory law or the United States Constitution. *See Karnes,* 62 F.3d at 490; *Cole v. Bone,* 993 F.2d 1328, 1334 (8th Cir.1993) (citing *Davis v. Scherer,* 468 U.S. 183, 193–94, 104 S.Ct. 3012, 3018–19, 82 L.Ed.2d 139 (1984)); *cf. Elkin v. Fauver,*

969 F.2d 48, 52 (3d Cir.) ("An alleged violation of state law ... does not state a claim under [S]ection 1983"), *cert. denied,* 506 U.S. 977, 113 S.Ct. 473, 121 L.Ed.2d 379 (1992). Even if the identifications did violate Procedure 108.1, that alone does not suggest a lack of probable cause giving rise to a Section 1983 claim. Accordingly, the Propsner Report does not create a genuine issue of material fact with regard to the existence of probable cause to defeat the instant Motion for Summary Judgment.

 Moreover, the actions of the Detectives were objectively reasonable. "[I]t is inevitable that law enforcement officers will in some cases reasonably but mistakenly conclude that probable cause to make an arrest is present." *Orsatti,* 71 F.3d at 483; *see also Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) ("probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information."). As stated, the issue is not whether the investigation was professionally executed, but whether the information on which the police officers base their arrest would warrant a reasonable person to believe that an offense has been committed by the person to be arrested. Here, Jordan and Flores had identifications of Green by two witnesses and the victim. It was objectively reasonable for the Detectives to believe Green had committed the shooting. The Detectives are protected by qualified immunity.

 In any event, the identifications were not so unreliable or untrustworthy as to undermine the probable cause basis for the arrest. Green argues the Defendants improperly conducted a "show-up" and permitted Carlswell and Fitts to identify Green as he left his home for the Detective Bureau with Jordan and Flores. Green criticizes the identification because it occurred more than

---

6. Section III A provides guidance to the Paterson Police Department on conducting on-scene identifications. The procedure states,
 An "on-scene" identification (Show-up) is one in which the suspect or suspects are apprehended at or near the scene and are returned to it immediately where victim/witnesses may make an identification.

*See* Section III attached to Arseneault Cert. as Exhibit G.

7. Section I outlines the procedure for a photographic identification. *See* Section I, attached to Arseneault Cert. as Exhibit G.

one and one half hours after the shooting and not at the crime scene. Green argues "[t]his is not a reasonable amount of time within which to conduct an 'on-scene' identification at a location other than where the shooting occurred." Opposition Brief at 19.

Green also questions the propriety of the identification by Carlswell and Fitts at the Detective Bureau. Green contends "instead of preparing an array of photographs, the way a photographic line-up should be conducted, the defendants compounded the existing tainted identification by showing the witnesses one photograph of [Green] two hours after the incident." Opposition Brief at 19. Green argues "there is a dispute as to whether these photographic identifications took place within ninety minutes, let alone a reasonable amount of time." *Id.* at 13.

■■■ A "show-up" identification "allows identification before the suspect has altered his appearance and while the witness' memory is fresh, and permits the quick release of innocent persons." *Marshall v. Borough of Ambridge*, 798 F.Supp. 1187, 1193 (W.D.Pa. 1992) (citing *Blanco v. Singletary*, 943 F.2d 1477, 1509 (11th Cir.1991), *cert. denied*, 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992)). Although an identification procedure may be suggestive, that in itself is not fatal to the reliability of the identification. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Reese v. Fulcomer*, 946 F.2d 247, 258–59 (3d Cir. 1991), *cert. denied*, 503 U.S. 988, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992). "It is only when that suggestibility in confrontation reaches impermissible or unfair limits that the pendulum swings to a finding of unreliability." *State v. Johnson*, 138 N.J.Super. 579, 351 A.2d 787 (App.Div.), *certif. denied*, 71 N.J. 340, 364 A.2d 1072 (1976).[8]

The question is whether the identification procedure was "unnecessarily suggestive and conducive to irreparable mistaken identification." *See Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)), *overruled on other grounds, Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *State v. Madison*, 109 N.J. 223, 232, 536 A.2d 254 (1988) ("a court must first decide whether the procedure in question was in fact impermissibly suggestive. If the court does find the procedure impermissibly suggestive, it must then decide whether the objectionable procedure resulted in a very substantial likelihood of misidentification.") (citations and internal quotations omitted); *Emanuele*, 51 F.3d at 1128 ("A government identification procedure violates due process when it is 'unnecessarily suggestive' and creates a 'substantial risk of misidentification.'") (citations omitted). A "suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability," for reliability is the "linchpin in determining the admissibility of identification testimony." *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 106, 114, 97 S.Ct. 2243, 2249, 2253, 53 L.Ed.2d 140 (1977)).

"The absence of taint, or conversely the presence of reliability, must be determined from 'the totality of the circumstances in the particular case.'" *State v. Cherry*, 289 N.J.Super. 503, 519, 674 A.2d 589 (App.Div. 1995) (citing *Madison*, 109 N.J. at 239, 536 A.2d 254). Certain factors to be given particularized attention are "1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the time of the confrontation; and 5) the time between the

---

**8.** Many of the cases cited discuss whether an identification should have been excluded at trial. *See, e.g., Johnson*, 138 N.J.Super. at 579, 351 A.2d 787 (direct appeal); *United States v. Emanuele*, 51 F.3d 1123 (3d Cir.1995) (same). *See also Biggers*, 409 U.S. at 199, 93 S.Ct. at 382 (habeas corpus petition); *Stovall*, 388 U.S. at 293, 87 S.Ct. at 1967 (same). The basis for excluding an identification at trial is an appropriate basis for determining whether an identification should be excluded from a probable cause analysis. *Brodnicki*, 75 F.3d at 1265 (employing *Biggers* factors to determine whether identification should be excluded from probable cause analysis). If an identification is reliable and proper under the standards employed in the criminal context (or quasi-criminal context), then, by analogy, it is also proper for the purpose of determining probable cause.

crime and the confrontation." *Id.; see also Emanuele,* 51 F.3d at 1128. The central issue is whether the identification was made because of the suggestiveness of the procedure, or as a result of independent recollection. *Id.; see also United States v. Bishop,* 66 F.3d 569, 572 & n. 2 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995).

Green has pointed to no evidence to indicate either the Ryerson Avenue identification or the photograph identification by Carlswell and Fitts at the Detective Bureau was conducted with such suggestibility as to deem the identifications unreliable. There is no evidence to suggest Carlswell or Fitts made an identification from anything other than their independent recollection of Green.

Both Carlswell and Fitts had the opportunity to view the suspect at the time of the shooting with a certain degree of attention. Both witnesses saw the shooting and then witnessed a black older man push a black female out of a vehicle. Fitts indicated he had "got a good look at" the driver. Both witnesses stated they saw Green in his vehicle at a traffic light on Van Houten Street. Green was driving the same vehicle both witnesses insisted they had chased from the crime scene to the traffic light on Van Houten Street immediately following the shooting. Green acknowledged two men had followed him and viewed him while at the traffic light. The vehicles were positioned in the same direction.

The witnesses demonstrated a high level of certainty at the time of the identification on Ryerson Avenue and during each of their voluntary statements. *See* Popewiny Dep. at 16–17; Carlswell Statement; Fitts Statement. As well, the time between the crime and the confrontation was not extensive. The Ryerson Avenue identification took place less than two hours after the shooting. *Compare Neil,* 409 U.S. at 201, 93 S.Ct. at 383 (lapse of seven months between crime and identification); *Cherry,* 289 N.J.Super. at 520, 674 A.2d 589 (identification after two and one half months).

Given the multiple sightings of both the vehicle and Green by the two witnesses within a short period from the time of the shoot-ing, it was not unreasonable for Jordan and Flores to believe the likelihood of misidentification was minimal in either the Ryerson Avenue identification or the photo identification at the Detective Bureau by Carlswell or Flores. Considering the totality of the circumstances, Jordan and Flores had no reason to question the reliability of the identifications. *Marshall v. Borough of Ambridge,* 798 F.Supp. at 1187 (show-up that occurred one hour after incident in police station not improper where witness had opportunity to see perpetrator).

■ As well, the identification by Session was not unreliable or untrustworthy. Green argues "[d]espite the victim's critical medical condition and altered judgment from heavy medication, [Popewiny] took a single photograph of [Green] ... to obtain an identification from [Session] ." Opposition Brief at 19. Green has presented no evidence to substantiate the claim that Session was under heavy medication. Indeed, a voluntary statement from the nurse on duty, obtained by the investigator for Green, indicates Session was not medicated and that she understood the questions being asked. *See* Statement from Audrey Clark ("Clark Statement"), attached to Connell Cert. as Exhibit L.

Jordan and Flores responded to the hospital within an hour of the shooting. They were informed by medical personnel Session was alert and responsive. Supplemental Police Report at 3. Upon questioning, Session indicated to the Detectives that she knew her attacker. Less than two hours after the shooting, Popewiny brought a single photo of Green to Session for a positive identification. Session identified the photo of Green as a picture of her attacker. The nurse on duty confirmed this response. *Id.* at 5.

Jordan and Flores had no reason to question the identification by Session, who was in close proximity to the person who shot her at the time of the incident. Moreover, her identification of Green was buttressed by the identifications of Carlswell and Fitts. The identification of Green by Session was not clouded by a substantial risk of misidentification. It was not unreasonable for Jordan and Flores to rely on this identification, or

the identifications by Carlswell and Fitts, for establishing probable cause for the arrest of Green.

### b. *Investigation*

 Green argues: "[T]he evidence and expert testimony demonstrate that the [D]efendants failed to consider the totality of the circumstances and properly investigate 'reasonable avenues of investigation' of the shooting." Opposition Brief at 20. Green argues the Defendants were required "to test [Green's] claim of innocence and his alibi during the time of the shooting." *Id.*

 A police officer, however, is under no obligation to forego arresting a suspect simply because the suspect claims he is innocent. *Brodnicki,* 75 F.3d at 1264; *Thompson v. Duke,* 882 F.2d 1180, 1186 (7th Cir.1989), *cert. denied,* 495 U.S. 929, 110 S.Ct. 2167, 109 L.Ed.2d 496 (1990); Neither is the police officer required to investigate or give credence to a suspect's alibi before making the probable cause determination to arrest the suspect. *Id.; Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir.1995). Accordingly, based upon the undisputed facts of this case, the asserted failure of Jordan or Flores to investigate the claim of innocence or alibi of Green is not a basis for a Section 1983 claim.

 Green contends "practical considerations of everyday life and common sense indicate that [Green] did not fit the profile of a drug user/dealer involved in a shooting in a drug infested neighborhood. [Green] is a church deacon whose character is blatantly inconsistent with the nature of this crime and the activities surrounding it." Opposition Brief at 21. Simply because Green is a deacon, however, is no basis for Jordan and Flores to have assumed he could not have been involved in a shooting in a drug related area. Green cites no legal authority for the proposition that certain individuals are immune from criminal activity due to their profession or associations. That Green is a deacon does not undermine the finding of probable cause for his arrest.

Green argues: "The most overwhelming oversight in the investigation is the failure to immediately search [the Y. Green Vehicle] where the shooting allegedly took place, even in the face of numerous requests to do so. The mere fact that the crime scene was the interior of a car should have prompted the officers to search his car immediately for evidence." Opposition Brief at 21.

Green further argues the Defendants failed to properly investigate reasonable avenues for investigation. Green contends the Detectives 1) waited nearly twenty-four hours to interview Ramnan, Green's alibi witness, 2) refused to take a statement from Green, although he attempted to give one, 3) made no effort to canvass the crime scene to locate witnesses other than those who came forward, 4) made no effort to confiscate Session's clothing for fibers or hairs, 5) made no effort to examine Green's clothing for traces of blood or fibers from the victim which would have been readily apparent, 6) never asked Green to give a urine test, 7) never obtained Session's fingerprints to compare to those found in Green's car, 8) never asked Green to take a polygraph test to confirm his claims of innocence, 9) did not take statements from three other witnesses, Yvonne Green or Ian Reid, 10) failed to determine, when they interviewed William James, where Session frequented to sell drugs so as to provide them with a specific area to canvass for witnesses. Opposition Brief at 23. Green contends a reasonable jury could conclude the Defendants actions were not reasonable and that a reasonable officer could believe that there was no probable cause to arrest Green. *Id.*

"Allegations that a police officer acted negligently do not state a claim for a Fourteenth Amendment violation actionable under [Section] 1983." *Romero,* 45 F.3d at 1478 (citing *Daniels,* 474 U.S. at 333, 106 S.Ct. at 666, *Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986); *Webber v. Mefford,* 43 F.3d, 1340, 1342 (10th Cir.1994)); *Sanders v. English,* 950 F.2d 1152, 1160 (5th Cir.1992). As discussed, the qualified immunity doctrine provides "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the *Law.*" *Orsatti,* 71 F.3d at 484 (citation and internal quotations omit-

ted). *See Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. The Third Circuit has stated:

> [F]or Fourth Amendment purposes, the issue is not whether the information on which police officers base their request for an arrest warrant resulted from a professionally executed investigation; rather, the issue is whether that information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.

*Orsatti,* 71 F.3d at 482.

■ Here, the conduct of the Detectives does not give rise to a civil rights violation. Green does not suggest the Defendants acted in bad faith or otherwise had a motive to conduct an inadequate investigation. Indeed, it appears the conduct of the two Detectives was proper. Jordan and Flores had three reliable identifications of Green as the individual who committed the shooting. An identification by a witness or victim is sufficient to make out probable cause for an arrest. *See United States v. Harris,* 956 F.2d 177, 180 (8th Cir.), *cert. denied,* 506 U.S. 827, 113 S.Ct. 85, 121 L.Ed.2d 48 (1992); *Dukes v. City of New York,* 879 F.Supp. 335, 341 (E.D.N.Y.1995). These identifications formed the basis for establishing probable cause. Any omissions in their investigation of the shooting did not undermine the probable cause basis. *See Clipper v. Takoma Park. Md.,* 876 F.2d 17, 20 (4th Cir.1989) ("We would not suggest that [Defendants] failure to investigate the leads that [plaintiff] provided was, in itself, sufficient to negate probable cause."). Accordingly, summary judgment is granted in favor of the Defendants for the Second Count of the Complaint.

### 2. *Post–Arrest Investigation*

■ In the Third Count of the Complaint, Green alleges the Defendants' failure to "properly investigate the circumstances surrounding the shooting of [Session] constitutes a violation of [Green's] right to due process under the Fifth and Fourteenth Amendment to the United States Constitution and [Section 1983]." Complaint, ¶ 26. Specifically, Green argues the Defendants failure to properly investigate the shooting after his arrest deprived him of his due process rights.[9] Opposition Brief at 25.

Green argues the Defendants may be liable for conducting the post-arrest investigation in a reckless or deliberately indifferent manner. *Id.* at 25–6 (citing *Romero,* 45 F.3d at 1478).

The parties cite no cases from the Third Circuit which address the duty of a police officer to investigate a crime after the arrest of an individual. Some circuits have addressed the issue of whether a police officer may be liable for conducting an unreasonable post-arrest investigation. *See Romero,* 45 F.3d at 1478–79 (plaintiff failed to allege conduct which amounted to constitutional violation in claim for unreasonable post-arrest investigation); *Sanders,* 950 F.2d at 1160–62 (police officer who deliberately ignores and fails to disclose exonerative evidence may be liable pursuant to Section 1983); *Simmons v. McElveen,* 846 F.2d 337 (5th Cir.1988); *cf. Whitley v. Seibel,* 613 F.2d 682, 686 (7th Cir.1980) ("If the officer undertakes to make decisions which are not his to make and then intentionally misleads those who do have the ultimate authority to authorize the arrest, that officer may be found to have deprived

---

9. Green argues the following conduct amounts to deliberate or reckless intent on the part of the Defendants:

1) the Defendants refused to conduct a search of the Y. Green Vehicle until three days after his arrest;

2) the Defendants failed to obtain the victims clothing for traces of blood and fibers before it was discarded;

3) the Defendants recklessly failed to take the victim's fingerprints to match to fingerprints on the Y. Green Vehicle;

4) the Defendants did not take statements from Green, Yvonne Green or Ian Reid;

5) the Defendants omitted any reference to the questioning of William James, who ultimately provided information which led to the assailant;

6) when the Defendants canvassed the area of the shooting, they only took a single photo of Green, and not one of Session, to enable them to determine whether anyone saw her on the day of the shooting; and

7) the Defendants took no action for a four day period after the arrest when they already had information corroborating Green's alibi.

*See* Opposition Brief at 26–7.

the arrestee of his liberty without due process of law").

The decisions cited above, however, hold that a post-arrest investigation may constitute a due process violation only where a police officer acts with deliberate or reckless intent to falsely imprison a plaintiff. *See Romero*, 45 F.3d at 1478. No liability can be imposed against an officer for failing to conduct a post-arrest investigation or failing to conduct it properly. *Id.* at 1479; *Sanders*, 950 F.2d at 1162.

The facts of the instant matter do not demonstrate deliberate or reckless indifference by the Detectives which would give rise to a Section 1983 claim for their conduct in the post-arrest investigation. Jordan and Flores never possessed concrete exculpatory information that they deliberately failed to disclose. *Compare Sanders*, 950 F.2d at 1161 (fact finder could reasonably conclude that the defendant "Looked the other way in the face of exonerating evidence"); *Clipper*, 876 F.2d at 19 (officer ignored witnessing officer's statement that he did not think plaintiff committed crime and failed to view bank surveillance film of robbery). *Contra Simmons*, 846 F.2d at 337 (where conduct amounts to no more than mere negligence, summary judgment for defendants was appropriate).

Significantly, Jordan and Flores advised the prosecutor of all the information they uncovered which weakened the case against Green. They informed the prosecutor that, although their investigation indicated it was still possible Green committed the crime, "doubts had been raised in their mind." *See* Certification of William J. Purdy ("Purdy Cert."), attached to Connell Cert. as Exhibit DD, ¶ 4. Moreover, Jordan and Flores advised the prosecutor of the evidentiary basis for their opinions. *Id.*

Green argues the conduct of the Defendants demonstrates a deliberate and reckless intent. *See* Opposition Brief at 26–7. This contention is not supported by evidence or otherwise. Green did not allege in the Complaint that the Defendants acted with deliberate or reckless indifference, *see* Complaint, Third Count; nor does Green suggest, in his Complaint or otherwise, that the conduct of the Defendants was in bad faith or pursuant to an ulterior motive. Even when viewed cumulatively, *id.* at 10 & n. 10, the evidence in the record does not establish deliberate and reckless conduct on the part of the Defendants. At best, the allegations raised by Green constitute negligence. Negligent actions by a police officer do not give rise to constitutional violations under Section 1983. *Daniels*, 474 U.S. at 327, 106 S.Ct. at 662–63. The Defendants are granted summary judgment on the Third Count of the Complaint.

### 3. *Conspiracy*

In the First Count of the Complaint, Green alleges the Defendants "conspired among themselves to deny [Green] of his constitution and civil rights contrary to the provisions of [Section 1983]." Complaint, ¶ 19. Green argues the Defendants chose to ignore all exculpatory evidence and pursued only those leads which they believed would point to Green. Opposition Brief at 29. Green argues "this biased and slanted mentality was willful and thus amounts to a conspiracy and deprivation of [Green's] constitutional rights." *Id.* Green did not submit any evidence to establish this argument.

To demonstrate a conspiracy under Section 1983, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of state law.'" *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir.1993) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970)) Green contends the Defendants, "by virtue of their actions throughout the investigation, conspired to deprive [him] of his [constitutional rights]." Opposition Brief at 28. Green points to statements made by Jordan and Flores that they did not take a statement from Green or the other three witnesses because such statements would not help the investigation. Green also points to the failure of the Defendants to canvass the crime scene the evening of the shooting. *Id.* at 28–9.

These actions fail to establish any factual basis for an agreement to deprive Green of his constitutional rights. In any event, as discussed, the conduct of the Defen-

dants in finding probable cause and investigating the shooting was not unconstitutional. In order to state a cause of action of conspiracy pursuant to Section 1983, a constitutional violation must occur. *See Singer v., Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); *Brennan v. Hendrigan*, 888 F.2d 189, 195 (1st Cir.1989) (for a conspiracy to be actionable under Section 1983, plaintiff must show both agreement and actual deprivation of constitutional right); *Rubin v. Smith*, 919 F.Supp. 534, 538–39 (D.N.H.1996) (same). *Cf. Dykes v. Southeastern Pennsylvania Transp. Auth.*, 68 F.3d 1564, 1570 (3d Cir.1995)(declining to reach issue of conspiracy pursuant to Section 1983 because complaint failed to allege cognizable violation of due process rights), *cert. denied*, —— U.S. ——, 116 S.Ct. 1434, 134 L.Ed.2d 556 (1996). Without a constitutional violation, a conspiracy to violate a constitutional right cannot stand. The Defendants are granted summary judgment on the First Count of the Complaint.

### C. *False Arrest*

■ In the Fifth Count of the Complaint,[10] Green alleges the Defendants "negligently failed to properly investigate the circumstances surrounding the shooting of [Session]." Complaint, 33. Green alleges as a result of the negligent act he was falsely arrested. *Id.*, ¶ 34.

"False arrest or false imprisonment is the constraint of the person without legal justification." *Fleming v. United Parcel Serv.*, 255 N.J.Super. 108, 155, 604 A.2d 657 (Law Div. 1992) (citing *Pine v. Okzewski*, 112 N.J.L.

429, 170 A. 825 (E. & A.1934)), *aff'd*, 273 N.J.Super. 526, 642 A.2d 1029 (App.Div. 1994), *certif. denied*, 138 N.J. 264, 649 A.2d 1285 (1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 139, 133 L.Ed.2d 85 (1995). "There are two elements to the tort: (1) an arrest or detention of the person against his will; (2) done without proper legal authority or 'legal justification.'" *Id.* (citing *Barletta v. Golden Nugget Hotel Casino*, 580 F.Supp. 614, 617 (D.N.J.1984)).

"Legal justification or probable cause for detention are the defenses to an action for false arrest or imprisonment." *Hayes v. Mercer County*, 217 N.J.Super. 614, 623, 526 A.2d 737 (App.Div.), *certif. denied*, 108 N.J. 643, 532 A.2d 226 (1987). As discussed above, there was sufficient basis in probable cause to detain and arrest Green for the shooting of Session. Accordingly, the Defendants are granted summary judgment on the Fifth Count of the Complaint.

### D. *Negligence*

■ In the Fourth Count of the Complaint, Green alleges the Defendants had a duty to properly investigate the circumstances concerning the shooting of Session, breached that duty and, as a proximate result, injured Green. Complaint, ¶¶ 28–31. Green argues "the [D]efendants' actions during the investigation amount to negligence and thus ... [the City of] Paterson is liable under the doctrine of *respondeat superior.*" Opposition Brief at 36. Green further contends "[the City of] Paterson is liable under the theory of negligent training and supervision."[11] *Id.*

---

10. Pursuant to 28 U.S.C. § 1367(c) ("Section 1367"), "[F]ederal courts shall exercise supplemental jurisdiction over pendent claims arising out of the same case or controversy and may decline to exercise jurisdiction if all [F]ederal claims are dismissed." *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1285 & n. 14 (3d Cir.1993). State law claims should be dismissed for lack of jurisdiction "unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995) (citing *Lovell Mfg. v. Export–Import Bank of the United States*, 843 F.2d 725 (3d Cir.1988)); *Growth Horizons, Inc.*, 983 F.2d 1277 (3d Cir. 1993). The instant matter was filed in 1995,

discovery has been completed, the parties are prepared for trial. Although the state law claims in the instant matter could be dismissed pursuant to Section 1367, considerations of judicial economy, convenience and fairness direct that the state law claims be addressed on the merits.

11. Defendants argue:

There is one count of [the Complaint] [citation omitted] entitled 'municipal liability,' specifically the Seventh Count. All paragraphs of that [c]ount pertain to an alleged violation of 'the constitutional and civil rights of [Green] and others.' None of the paragraphs make any reference to a State cause of action for negligent training. Therefore, since [Green]

## 910

■ The New Jersey Tort Claims Act states:

[A] public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or imprisonment.

N.J.S.A. 59:3–3. Under this provision, immunity may be established "if the public employee can show either objective or subjective good faith." *B.F. v. Division of Youth and Family Serv.*, 296 N.J.Super. 372, 385, 686 A.2d 1249 (App.Div.1997) (quoting *Bombace v. City of Newark*, 125 N.J. 361, 374, 593 A.2d 335 (1991)); *Hayes*, 217 N.J.Super. at 622, 526 A.2d 737. If a public employee's conduct is objectively reasonable, subjective good faith need not be established to prevail on a motion for summary judgment. "Subjective good faith ... remains available to a public employee as a second line of defense, which he may raise at trial even if he was not acting reasonably." *Id.* (citing *Hayes*, 217 N.J.Super. at 614, 526 A.2d 737). "To pierce [this section's] qualified immunity, a plaintiff must prove more than ordinary negligence." *Canico v. Hurtado*, 144 N.J. 361, 365, 676 A.2d 1083 (1996) (citing *Marley v. Borough of Palmyra*, 193 N.J.Super. 271, 294, 473 A.2d 554 (Law Div.1983) (stating that recklessness usually denies good faith)). *See also B.F.*, 296 N.J.Super. at 386, 686 A.2d 1249 ("ordinary negligence is an insufficient basis for holding liable a public employee involved in the execution of the law under N.J.S.A. 59:3–3")(citing *Fielder v. Stonack*, 141 N.J. 101, 123–32, 661 A.2d 231 (1995)).

As discussed, the actions of the Defendants were objectively reasonable. Green has submitted no evidence to pierce the qualified immunity of the Defendants in his allegation that they failed to properly investigate the shooting incident. Accordingly, the individual Defendants are entitled to summary judgment. Because the individual Defendants are not liable, the City of Paterson is not liable under the doctrine of *respondeat superior. See* N.J.S.A. 59:2–2 ("A public entity is

liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances."). As will be discussed, Green also has not demonstrated the City of Paterson was negligent for the failure to train the Defendants. *See* Section F, *infra.*

### E. Intentional and Negligent Infliction of Emotional Distress

■ In the Sixth Count of the Complaint, Green alleges the conduct of the defendants "intentionally and negligently inflicted emotional distress upon [him]." Complaint, ¶ 37. Green argues:

[T]he [D]efendants' actions in wrongfully arresting [him] without probable cause and failing to properly investigate the shooting while he remained in jail for eight days over Thanksgiving were extreme and outrageous and utterly intolerable. Despite obvious signs of [Green's] innocence, the [D]efendants deliberately chose not to pursue reasonable and readily available avenues of investigation simply because they were afraid what they would find would not help their case against [Green]. The [D]efendant's actions were taken intentionally and with disregard of the high probability of emotional distress that [Green] undoubtedly knew that [Green] who repeatedly professed his innocence was a church deacon and a role model to his church community.

Opposition Brief at 39. Green argues as a result of his arrest, he was emotionally distraught and sought counseling from his church, missed nearly two weeks from work, was required to use all of his sick and compensation time and was immediately suspended from substitute teaching. *Id.* Green argues he has suffered humiliation, embarrassment, and severe damage to his reputation with his employers and his peers. *Id.*

---

never pleaded this cause of action, [the City of] Paterson can not be held liable for it.
Reply Brief at 14. It does not appear a state negligence claim against the City of Paterson has

been alleged. As will be discussed in Section F of this opinion, this allegation is without merit.

"Intentional infliction of emotional distress consists of 'extreme and outrageous conduct [which] intentionally or recklessly causes severe emotional distress to another.'" *Lingar v. Live-in Companions, Inc.*, 300 N.J.Super. 22, 34, 692 A.2d 61 (App.Div.1997) (citing *Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 355, 366, 544 A.2d 857, (1988)) (quoting Restatement (Second) of Torts § 46 (1965)). To establish a claim for intentional emotional distress, Green must prove (1) conduct by Defendants "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community," (2) an intentional act, committed with the intent to produce emotional distress or in deliberate disregard of a high degree of probability that emotional distress will follow, (3) causation and resulting emotional distress that is "so severe that no reasonable [person] could be expected to endure it." *Glenside West Corp. v. Exxon Co., USA*, 761 F.Supp. 1100, 1113 (D.N.J.1991) (quoting *Buckley*, 111 N.J. 355, 366, 544 A.2d 857 (1988)); *see Subbe–Hirt v. Baccigalupi*, 94 F.3d 111, 114 (3d Cir.1996); *Pitak v. Bell Atlantic Network Servs., Inc.*, 928 F.Supp. 1354, 1371 (D.N.J.1996); *Bishop v. Okidata, Inc.*, 864 F.Supp. 416, 427 (D.N.J.1994); *Gennari v. Weichert Co. Realtors*, 288 N.J.Super. 504, 550, 672 A.2d 1190 (App.Div.1996), *aff'd as modified*, 148 N.J. 582, 691 A.2d 350 (1997).

"One New Jersey court found conduct constituting intentional infliction of emotional distress where a physician knowing it to be false, told parents their son was suffering from cancer." *Glenside West*, 761 F.Supp. at 1113 (discussing *Hume v. Bayer*, 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981)). The elements were established in another case where a hospital was unable to locate the body of a deceased baby for three weeks. *Id.* (discussing *Muniz v. United Hosps. Med. Ctr. Presbyterian Hosp.*, 153 N.J.Super. 79, 379 A.2d 57 (App.Div.1977)). Other courts have deemed awards for intentional infliction of emotional distress were appropriate in a case where a defendant spread a false rumor that the plaintiff's son had hung himself, where the defendants brought a mob to the plaintiff's door and threatened to lynch him if he did not leave town, and where a "gory dead rat [was wrapped] inside a loaf of bread for a sensitive person to open." *Id.* at 1113–14 (citations omitted).

The facts of the instant case do not support a claim for intentional infliction of emotional distress. There is no indication the Defendants intended to cause Green emotional distress. Green has not argued facts to demonstrate the conduct of the Defendants was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Subbe–Hirt*, 94 F.3d at 114. Green has not demonstrated his distress was "so severe that no reasonable man could be expected to endure." *See Buckley*, 111 N.J. at 366, 544 A.2d 857.

"Negligent infliction of emotional distress consists of 'negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care.'" *Lingar*, 300 N.J.Super. at 34, 692 A.2d 61 (citing *Decker v. Princeton Packet, Inc.*, 116 N.J. 418, 429, 561 A.2d 1122 (1989)). The four elements of negligent infliction of emotional distress are: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Portee v. Jaffee*, 84 N.J. 88, 101, 417 A.2d 521 (1980); *Greene v. Memorial Hospital of Burlington County*, 299 N.J.Super. 372, 382, 691 A.2d 369 (App. Div.1997); *Trisuzzi v. Tabatchnik*, 285 N.J.Super. 15, 26, 666 A.2d 543 (App.Div. 1995).

"To be compensable, emotional distress must be 'sufficiently substantial to result in physical illness or serious psychological sequelae.'" *Trisuzzi*, 285 N.J.Super. at 27, 666 A.2d 543 (citing *Eyrich for Eyrich v. Dam*, 193 N.J.Super. 244, 253, 473 A.2d 539 (App. Div.), *certif. denied*, 97 N.J. 583, 483 A.2d 127 (1984)). The distress must be "sufficiently palpable, severe or enduring." *Id.* (citing *Decker*, 116 N.J. at 431, 561 A.2d 1122).

The New Jersey Supreme Court has recognized a claim for negligent infliction of

emotional distress, for example, when medical malpractice during pregnancy resulted in a still born child, *see Giardina v. Bennett*, 111 N.J. 412, 420, 545 A.2d 139 (1988), and when a hospital negligently failed to release to parents corpse of their brain-dead son. *Strachan v. John F. Kennedy Memorial Hosp.*, 109 N.J. 523, 538 A.2d 346 (1988). Recovery was not available, however, to the wife of a dog bite victim who witnessed her husband being bitten. The court found the physical injuries of the husband were not sufficient to establish a claim under *Portee. Trisuzzi*, 285 N.J.Super. at 25, 666 A.2d 543.

■ Green argues the Defendant's failure to properly investigate the shooting of Session amounts to negligence. Opposition Brief at 40. As a result of such negligence, Green contends he suffered emotional distress as he was humiliated, embarrassed and suffered "devastating damage to his professional reputation." Opposition Brief at 40. Green has failed to allege the severe emotional distress required to recover under negligent infliction of emotional distress. *See Gennari*, 148 N.J. at 612, 691 A.2d 350. Summary Judgment is granted to the Defendants on the Sixth Count of the Complaint.

### F. *Municipal Liability*

In the Seventh Count of the Complaint, Green alleges the City of Paterson failed to train and supervise its agents and/or employees which caused the deprivation of his rights. Complaint, ¶¶ 38–44. Green argues "the [c]ity's policy of conducting pre-investigation arrests, specifically pre-trial identifications, was unconstitutionally applied by the [Defendants] and thus [the City of Paterson] is liable because it failed to adequately train them." Opposition Brief at 29. Green also argues that "the [Defendant's] consistent pattern of unconstitutional conduct in their encounters with suspects, arrestees, persons in custody in law enforcement situations amounts to unlawful municipal custom or usage in violation of his [or her] constitutional rights." *Id.* at 29.

■ As discussed, the actions of the Defendants were not unconstitutional because there was sufficient probable cause for the arrest of Green. Because the arrest was

lawful, there was no underlying constitutional violation for which the City of Paterson, or any of the other Defendants, could be held liable. *See Kneipp*, 95 F.3d at 1212 & n. 26; *Fagan v. City of Vineland*, 22 F.3d 1283, 1291 (3d Cir.), *aff'd in part*, 22 F.3d 1296 (1994) (en banc). *See also Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). In any event, Green has failed to demonstrate a basis for municipal liability pursuant to the condoned custom or failure to train theories.

### 1. *Condoned Custom and Usage of Unconstitutional Conduct*

■ A local governmental entity cannot be held liable pursuant to supervisor liability for the conduct of its employees. *Cf. Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1086, 137 L.Ed.2d 219 (1997). A municipality or local governing body may be liable, however, if the offending actions were performed pursuant to governmental custom or policy, whether formally or informally adopted. *See Monell v. Dep't of Social Serv. of City of New York*, 436 U.S. 658, 690–92, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978); *Carver v. Foerster*, 102 F.3d 96, 102 (3d Cir.1996); *Kneipp*, 95 F.3d at 1211; *Beck*, 89 F.3d at 971; *Czurlanis v. Albanese*, 721 F.2d 98, 108 (3d Cir.1983); *Litz v. City of Allentown*, 896 F.Supp. 1401, 1411 (E.D.Pa.1995) ("[a] municipality can be sued directly under Section 1983 if action pursuant to municipal policy, practice or custom causes a constitutional tort"); *see Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) ("[o]fficial policy must be 'the moving force of the constitutional violation' in order to establish the liability of the government body under [Section] 1983").

An action is pursuant to governmental policy where a decision maker possessing final authority "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36. An act is conducted pursuant to a municipal custom where it implements "a given course of conduct, [which,] although not specifically endorsed or autho-

rized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990). *See also Monell,* 436 U.S. at 658, 98 S.Ct. at 2019. Custom may also be evidenced through knowledge and acquiescence, *see Beck,* 89 F.3d at 971 (citing *Fletcher v. O'Donnell,* 867 F.2d 791, 793 (3d Cir.), *cert. denied,* 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989)), or "may be inferred from omissions and informal acts." *Freedman v. City of Allentown,* 853 F.2d 1111, 1116 (3d Cir.1988) (citations omitted).

■■■ Green argues the Defendants' actions in conducting the pre-trial identifications amounts to a consistent pattern of unconstitutional conduct condoned by the City of Paterson. Opposition Brief at 33. Green submits "[t]he [D]efendants contend that the practices and policies applied were those applied to all of the cases they worked on." *Id.*[12] Green submits Reid, who was in charge of the Criminal Investigation Division of the Paterson Police Department, not only had knowledge of the unlawful conduct, but participated in the decision to arrest Green. *Id.* Green submits Reid "made the decision to show a single photograph to [Session] [citation omitted] and either he, or [Jordan and Flores], under his supervision, made the decision [to show the photograph] to the witnesses." *Id.*

■■■ As discussed, the conduct of the Defendants during the investigation and arrest was not unconstitutional. In any event, the arguments of Green focus on one incident of behavior by the Defendants. A single incident of unconstitutional behavior by a police officer, without any direct involvement by a municipal policy maker, is not sufficient to impose municipal liability. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *City of Oklahoma v. Tuttle,* 471 U.S. 808, 822, 105 S.Ct. 2427, 2435–36, 85 L.Ed.2d 791 (1985). Green has not demonstrated Reid to be a "policy-maker" for the purposes of establishing municipal liability. *Pembaur,* 475 U.S. at 481–82, 106 S.Ct. at 1299 ("Municipal liability attaches only where the decisionmaker pos-

sesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.") Summary judgment is granted to the City of Paterson on the allegation of condoned conduct or usage.

### 2. *Failure to Train*

The Supreme Court has held Section 1983 liability may "attach to a municipality if it had a policy or custom of failing to train its employees and that failure caused the underlying constitutional violation." *Kneipp,* 95 F.3d at 1211 (citing *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *Beck,* 89 F.3d at 971; *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1148 (3rd Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995); *DiLoreto v. Borough of Oaklyn,* 744 F.Supp. 610, 623 (D.N.J.1990). However, "the inadequacy of police training may serve as the basis for [S]ection 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact." *City of Canton,* 489 U.S. at 388, 109 S.Ct. at 1204. The Court further explained:

> Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under [Section] 1983.... Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under [Section] 1983.

*Id.* at 389, 109 S.Ct. at 1205. In addition, a plaintiff must demonstrate the "deficiency in training actually caused the police officers' indifference to the [individual] ." *Id.* at 391, 109 S.Ct. at 1206.

■■■Green argues the City of Paterson failed to properly train and supervise the

---

**12.** Green offers no citation to the record for this proposition.

Defendants with respect to numerous aspects of a police investigation. Opposition Brief at 30. Green specifically argues the Defendants were not properly trained on identification procedures, as evidenced through the Ryerson Avenue identification and the photo identifications.[13] *Id.* at 31–3.

As stated, the conduct of the Defendants during the investigation and arrest of Green was not unconstitutional. *See Fagan,* 22 F.3d at 1291 (to meet deliberate indifference standard for the failure to train, a plaintiff must show that the city's policy actually caused a constitutional injury.). Green has not submitted any evidence to demonstrate the "failure to train reflects a 'deliberate' or 'conscious' choice by [the City of Paterson]" for which it can be liable under Section 1983. *Harris,* 489 U.S. at 389, 109 S.Ct. at 1205. Green has also failed to establish that the deficient training caused the alleged constitutional deprivation.[14] Summary judgment on the Seventh Count of the Complaint is granted to the City of Paterson.

### G. *McMillan*

 The Defendants argue McMillan had no personal involvement in the arrest of Green or the decision to arrest Green. Moving Brief at 36. "Section 1983 looks to personal action in the deprivation of constitutional rights, rather than damage alleged by a chain of various responsibility." *Sullivan v. State of New Jersey Div. Of Gaming Enforcement,* 602 F.Supp. 1216, 1220 (D.N.J. 1988), *aff'd,* 853 F.2d 921 (3d Cir.1988). *See* *also Irby v. Sullivan,* 737 F.2d 1418, 1425 (5th Cir.1984) (individual may be held personally liable under § 1983 if he or she was personally involved in the unconstitutional conduct or there was a causal connection between the individual's acts and the constitutional violation). There must be a causal connection between a police officer's conduct and the alleged constitutional deprivation. *Irby,* 737 F.2d at 1425.

McMillan had no personal involvement in the arrest of Green or the decision to arrest Green. McMillan was not consulted by Jordan or Flores as to whether there was probable cause to arrest Green. *See* Jordan Dep. at 191. McMillan had no involvement in the post-arrest investigation. McMillan's sole act was to obtain a written statement from Carlswell. The information Carlswell provided to McMillan did not differ from the information Carlswell had previously provided orally to Popewiny, Jordan and Flores. Accordingly, summary judgment is granted in favor of McMillan.

### Conclusion

Based on the foregoing, the Motion for Summary Judgment is granted.

---

13. The arguments Green raises in support of municipal liability have already been addressed in this opinion. For example, Green argues the on-scene identifications violated Section III A of Procedure 108.1 because they were not done "immediately." Green contends the Defendants were not properly trained as to this procedure because both they and their supervisor, Reid, believed the Ryerson Avenue identification was proper. Green also argues the single photo identifications, as opposed to a photo array, violated Procedure 108.1. Green offers as evidence of the failure to train the statements of the Defendants that "such identifications were made within a reasonable period of time and were consistent with their training." Opposition Brief at 32.

As discussed, the failure to comply with a police department procedure does not in itself create a constitutional violation. Based upon the facts of the instant case, the Ryerson Avenue identification or the photographic identifications were not susceptible to misidentification and, therefore, were not improper. *See, supra,* Section (B). Accordingly, the Defendants actions cannot be used to demonstrate a failure to train.

14. Green also argues a municipal entity has a duty to give its police officers adequate training and supervision and that the failure to do so will result in a cause of action for negligence. Opposition Brief at 37 (citing *McAndrew v. Mularchuk,* 33 N.J. 172, 162 A.2d 820 (1960)). In support of this contention, Green relied upon the arguments he raised for imposing Section 1983 municipal liability on the City of Paterson. Accordingly, for the same reasons the City of Paterson is not liable pursuant to Section 1983, the City of Paterson is not liable pursuant to a theory of negligence.